**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE R. KENTON MUSGRAVE**

---

|  |  |  |
|---|---|---|
| GOLDEN DRAGON PRECISE COPPER TUBE GROUP, INC., HONG KONG GD TRADING CO., LTD., GOLDEN DRAGON HOLDING (HONG KONG) INTERNATIONAL LTD., AND GD COPPER (U.S.A.), INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Consol. Court No. 14-116 |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| CERRO FLOW PRODUCTS, LLC, WIELAND COPPER PRODUCTS, LLC, MUELLER COPPER TUBE PRODUCTS, INC., AND MUELLER COPPER TUBE COMPANY, INC., | ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

---

**PLAINTIFF GOLDEN DRAGON'S RULE 56.2 MOTION
<u>FOR JUDGMENT ON THE AGENCY RECORD</u>**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiffs Golden Dragon Precise Copper

Tube Group, Inc., Hong Kong GD Trading Co., Ltd., Golden Dragon Holding (Hong Kong)

International Ltd., and GD Copper (U.S.A.), Inc. (collectively, "Golden Dragon") hereby move

for judgment on the agency record with regard to the final results issued by the U.S. Department

of Commerce ("Commerce") in the 2011-2012 administrative review of the antidumping duty

order on seamless refined copper pipe and tube from the People's Republic of China, which

covered imports for the period November 1, 2011 through October 31, 2012, published in *Seamless Refined Copper Pipe and Tube from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 23,324 (Dep't of Commerce Apr. 28, 2014), as amended by *Seamless Refined Copper Pipe and Tube from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 47,091 (Dep't of Commerce Aug. 12, 2014) ("*Final Results*").

The legal and factual grounds for Plaintiff Golden Dragon's motion are set forth in the accompanying Rule 56.2 Brief in Support of Motion for Judgment on the Agency Record.  A proposed order is attached.

WHEREFORE, Plaintiff respectfully requests that this Court grant this motion, hold that Commerce's *Final Results* are unsupported by substantial evidence and are otherwise not in accordance with law, and remand the case with instructions to (i) recalculate Golden Dragon's dumping margin using the standard average-to-average comparison methodology without zeroing as required by the antidumping statute, and (ii) recalculate Golden Dragon's dumping margin by selecting Ukraine as the surrogate country in this administrative review and more accurately calculate the financial ratios for the Thai companies, as described in Golden Dragon's accompanying Rule 56.2 Brief in Support of Motion for Judgment on the Agency Record.

Dated: <u>November 25, 2014</u>

Respectfully submitted,

<u>/s/  *Kevin M. O'Brien*</u>
Kevin M. O'Brien
Christine M. Streatfeild
Yi Fang

*Counsel for Golden Dragon Precise Copper Tube Group, Inc., Hong Kong GD Trading Co., Ltd, Golden Dragon Holding (Hong Kong) International, Ltd., and GD Copper (U.S.A.),Inc.*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE R. KENTON MUSGRAVE**

|  |  |  |
|---|---|---|
| GOLDEN DRAGON PRECISE COPPER TUBE GROUP, INC., HONG KONG GD TRADING CO., LTD., GOLDEN DRAGON HOLDING (HONG KONG) INTERNATIONAL LTD., AND GD COPPER (U.S.A.), INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) | Consol. Court No. 14-116 |
| v. | ) ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | |
| and | ) ) | |
| CERRO FLOW PRODUCTS, LLC, WIELAND COPPER PRODUCTS, LLC, MUELLER COPPER TUBE PRODUCTS, INC., AND MUELLER COPPER TUBE COMPANY, INC., | ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

**ORDER**

Upon consideration of Plaintiff Golden Dragon's Motion for Judgment on the Agency Record and accompanying Rule 56.2 Brief in Support thereof, and upon all other papers filed and proceedings had herein, it is hereby:

ORDERED that Plaintiff's Motion for Judgment on the Agency Record is granted; and it is further

ORDERED that the determination by the U.S. Department of Commerce to calculate Golden Dragon's weighted-average dumping margin using an alternative comparison methodology as set forth in *Seamless Refined Copper Pipe and Tube from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 23,324 (Dep't of Commerce Apr. 28, 2014), as amended by *Seamless Refined Copper Pipe and Tube from the People's Republic of China: Amended Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 47,091 (Dep't of Commerce Aug. 12, 2014) is not supported by substantial evidence and otherwise not in accordance with law; and it is further

ORDERED that this matter is remanded to the Department of Commerce to recalculate Golden Dragon's weighted-average dumping margin using the average-to-average comparison methodology; and it is further

ORDERED that this matter is remanded to the Department of Commerce with instructions to select Ukraine as the surrogate country for valuation of factors of production and to recalculate the financial ratios in accordance with the Court's opinion.

SO ORDERED.


Dated: _____                    _____
      New York, NY                                R. Kenton Musgrave, Senior Judge

2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE:  THE HONORABLE R. KENTON MUSGRAVE**

---

| | |
|---|---|
| GOLDEN DRAGON PRECISE COPPER TUBE GROUP, INC., HONG KONG GD TRADING CO., LTD., GOLDEN DRAGON HOLDING (HONG KONG) INTERNATIONAL LTD., AND GD COPPER (U.S.A.), INC., )))))) | |
| Plaintiffs, ) | Consol. Court No. 14-116 |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | NON-CONFIDENTIAL VERSION |
| ) | |
| and ) | |
| ) | |
| CERRO FLOW PRODUCTS, LLC, WIELAND COPPER PRODUCTS, LLC, MUELLER COPPER TUBE PRODUCTS, INC., AND MUELLER COPPER TUBE COMPANY, INC., ))))))) | |
| ) | |
| Defendant-Intervenors. ) | |

---

**BRIEF OF GOLDEN DRAGON IN SUPPORT OF ITS**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Kevin M. O'Brien
Christine M. Streatfeild
Yi Fang

BAKER & McKENZIE LLP
815 Connecticut Ave., N.W.
Washington, D.C.
20006 (202) 452-7000

November 25, 2014

Counsel for Plaintiff
Golden Dragon Entities

## TABLE OF CONTENTS

ADMINISTRATIVE DETERMINATION UNDER REVIEW ..................................................... 2

ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE
      ADMINISTRATIVE DETERMINATION ........................................................ 2

STATEMENT OF FACTS………………………………………………………………………..2

I.      The Differential Pricing Analysis As Applied to Golden Dragon's Contractually-Set U.S.
      Prices.......................................................................................................................... 3

      A.      The Department's Differential Pricing Methodology …………………………5

      B.      The Department's Different Approaches in the Preliminary and Final
            Determinations……………………………………………………………………6

II.      Surrogate Country Selection and Factors of Production Values ....................................... 7

SUMMARY OF THE ARGUMENT………………………………………………………………9

ARGUMENT……………………………………………………………………………………10

I.      The Department's Differential Pricing Analysis Is Contrary to Law and Is Not Supported
      By Substantial Evidence on the Record of this Review. .................................................. 10

      A.      Legal Standard of Review.................................................................................. 11

      B.      The Statute Requires a "Strategy" of Pricing Patterns that is not Present Here. .. 12

      C.      The Department Unlawfully Found Targeted Dumping When the Purported
            Differences in U.S. Prices Resulted from the LME-Set Metal Price.................... 16

II.      The Department's Selection of Thailand as the Surrogate Country and Use of Thai
      Surrogate Value Data is Not Supported by the Law......................................................... 22

      A.      Ukraine was the Most Appropriate Surrogate Country. ....................................... 24

      B.      The Department Should Have Relied on the Best Available Information to
            Calculate Financial Ratios: the JSC Artemivskyy Plant 2012 Financial Statement.
            ................................................................................................................. 26

            i.  Even Using the Thai Data, the Department Double-Counted Certain
            Expenses. ................................................................................................. 27

ii.  The Department Did Not Base the Surrogate Labor Cost on the Most
Industry-Specific Data Available……………………………………………..27

CONCLUSION…………………………………………………………………………..28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Agro Dutch Indus., Ltd. v. United States,*
    30 C.I.T. 799 (Ct. Int'l Trade 2006) ......................................................................11

*AMS Assocs. v. United States,*
    881 F. Supp. 2d 1374 (Ct. Int'l Trade 2012) ........................................................11

*Arch Chems., Inc. v. United States,*
    33 C.I.T. 954 (Ct. Int'l Trade 2009) ...............................................................11, 17

*Atlantic Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................................11

*Borden, Inc. v. United States,*
    4 F. Supp. 2d 1221 (Ct. Int'l Trade 1998) ...............................................14, 15, 17

*Carpenter Tech. Corp. v. United States,*
    26 C.I.T. 830 (Ct. Int'l Trade 2002) ....................................................................11

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
    467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984) ................................12, 20

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ..............................................................................................19

*FAG Italia S.p.A. v. United States,*
    291 F.3d 806 (Fed. Cir. 2002) ..............................................................................20

*Rhodia, Inc. v. United States,*
    25 Ct. Int'l Trade 1278, 185 F. Supp. 2d 1343 (2001) ..........................................11

*The Stanley Works (Langfant) Fastening Sys. Co. v. United States,*
    964 F. Supp. 2d 1311 (Ct. Int'l Trade 2013) .......................................................21

*Star Fruits S.N.C. v. United States,*
    393 F.3d 1277 (Fed. Cir. 2005) ............................................................................11

*Timken Co. v. United States,*
    968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014) ..........................................10, 12, 20

*U.S. Steel Corp. v. United States,*
    621 F.3d 1351 (Fed. Cir. 2010) .......................................................................11, 14

*Wheatland Tube Co. v. United States*,
   161 F.3d 1365 (Fed. Cir. 1998)............................................................................11

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) (2000)......................................................................11

19 U.S.C. § 1677b(c)(1)..........................................................................................21

19 U.S.C. § 1677b(c)(4)..........................................................................................21

19 U.S.C. § 1677f-1(d)............................................................................................13

19 U.S.C. § 1677f-1(d)(1)(B) ..........................................................................passim

19 U.S.C. § 3512(d)................................................................................................13

Section 777A(d)(1)(B) of the Tariff Act ......................................................12, 13, 14

## OTHER AUTHORITIES

19 C.F.R. § 351.408(c)(4)........................................................................................21

19 C.F.R. § 351.414(c)(1)........................................................................................20

19 CFR 351.414(c)(1)..............................................................................................12

Court of International Trade Rule 56.2........................................................................1

Pursuant to Court of International Trade Rule 56.2 and the Scheduling Order entered by this Court on September 30, 2014 (Dk. No. 44), Plaintiffs, Golden Dragon Precise Copper Tube Group, Inc., Hong Kong GD Trading Co., Ltd, Golden Dragon Holding (Hong Kong) International, Ltd., and GD Copper (U.S.A.) (collectively "Golden Dragon"), file this brief in support of their Rule 56.2 motion for judgment upon the agency record.   Golden Dragon challenges (i) the Department of Commerce's determination that Golden Dragon engaged in targeted dumping and decision to apply a "mixed" alternative methodology in calculating Golden Dragon's weighted-average dumping margin; and (ii) the Department's selection of Thailand as the surrogate country and calculation of Thai financial ratios and labor rates.

The Department relied on an exceptional comparison methodology provided by 19 U.S.C. § 1677f-1(d)(1)(B) to conclude that targeted dumping had occurred, *without* finding that Golden Dragon selectively set prices and without considering that the vast majority of Golden Dragon's sales were to one customer, sold to one region, and fixed by a contractual pricing formula.   The Department's determination conflicts with the language of the statute, which requires that the Department identify a "pattern" of prices that differ among customers, regions, or time periods; has no grounding in the legislative history, which indicates an intent to address targeted or masked dumping by a respondent; and contradicts the case law, which has repeatedly defined targeted dumping as requiring action on the part of the respondent to engage in a selective dumping practice.   Golden Dragon did not adjust or revise its pricing during the period of review.   As such, the Department's analysis identified neither a "pattern" of prices nor targeted dumping, and instead inflated Golden Dragon's weighted-average margin based only on price variation caused by  third-party  commodity prices.  This result is unlawful and should be vacated.

## ADMINISTRATIVE DETERMINATION UNDER REVIEW

The determination under review is the Department's final results in the second administrative review of the antidumping duty order on seamless refined copper pipe and tube from the People's Republic of China, published as *Seamless Refined Copper Pipe and Tube From China: Final Results of Administrative Duty Review; 2011-2012,* 79 Fed. Reg. 23,324 (Apr. 28, 2014) (P.R. 176 [1]), as amended in 79 Fed. Reg. 47,091 ("*Final Results*") (P.R. 173). The *Final Results* cover Golden Dragon's imports of copper pipe and tube from November 1, 2011 through October 31, 2012.

## ISSUES OF LAW PRESENTED AND REASONS FOR CONTESTING THE ADMINISTRATIVE DETERMINATION

1.  Whether the Department's application of its differential pricing methodology to Golden Dragon's sales is unlawful and unsupported by substantial evidence where the record of this review demonstrates that virtually all U.S. sales were to a single customer and the changes in price were due to changes in the London Metal Exchange ("LME") commodity price of copper.

2.  Whether the Department's determination to select Thailand and value the factors of production using Thai data was unlawful when Golden Dragon provided publicly-available data from Ukraine, a country at a level of economic development comparable to China and a significant exporter of identical merchandise, and the newly-submitted Ukrainian financial statement presents reliable and contemporaneous data.

## STATEMENT OF FACTS

In the *Final Results*, the Department applied its "differential pricing analysis," based on 19 U.S.C. § 1677f-1(d)(1)(B), and used the average-to-transaction ("A-to-T") methodology to calculate Golden Dragon's margins for sales that it concluded did not "pass" the differential pricing analysis tests.  *Second Administrative Review of the Antidumping Duty Order on Seamless Refined Copper Pipe and Tube from the People's Republic of China: Analysis for the*

---

[1] Citations to the administrative record refer to the public or confidential document number ("P.R. __" or "C.R.__").

*Final Results*, Case No. A-570-964 (Apr. 21, 2014) (C.R. 118) ("*Final Results Analysis Memo*") at 1-3 (calculating a 4.50 percent weighted-average dumping margin for Golden Dragon).  On July 18, 2014, this Court granted the Department leave to publish amended final results regarding an allegation of a ministerial error (unrelated to the issues raised below).  The Department published revised final results on August 12, 2014, in which the Department calculated a 4.48 percent weighted-average dumping margin for Golden Dragon.  P.R. 173, *Final Results*.  The Department's differential pricing analysis and surrogate country selection and valuation of factors of production remained unchanged in the amended final results.

I.     **The Differential Pricing Analysis As Applied to Golden Dragon's Contractually-Set U.S. Prices**

The statute, 19 U.S.C. § 1677f-1(d)(1)(B), requires that certain criteria be satisfied for the Department to use the exceptional A-to-T method as an alternative to the standard average-to-average ("A-to-A") method in antidumping investigations.  The Department's analysis under this provision has taken several forms in recent years: targeted dumping analysis, the *Nails* test, and here, differential pricing analysis.  *See generally Differential Pricing Analysis; Request for Comments*, 79 Fed. Reg. 26,720 (May 9, 2014).  While called different names by the Department, each form of the analysis proceeds from the same statutory provision and legislative history and seeks to address the behavior identified by Congress and the courts – namely, targeted or masked dumping.  *See Decision Memorandum for the Preliminary Results of the 2011-2012 Administrative Review of the Antidumping Duty Order on Seamless Refined Copper Pipe and Tube from the People's Republic of China*, Case No. A-570-964 (Nov. 14, 2013) (P.R. 126) ("*Prelim Decision Memo*") at 13 ("The Department will continue to develop its approach in this area based on comments received in this and other proceedings, and on the Department's additional experience with addressing the **potential masking of dumping** that can occur when

the Department uses the average-to-average method in calculating weighted-average dumping margins.") (emphasis added).

In this administrative review, Golden Dragon submitted information to the Department establishing that virtually all of its U.S. sales were made pursuant to a contract with a single U.S. customer.  The contract set forth a formula by which Golden Dragon's customer, [

              ], would pay a  U.S. price that consisted of two components: the copper metal price plus the "base price" (largely the fabrication charge). *See* Golden Dragon Section A Response, Case No. A-570-964 (Mar. 6, 2013) (C.R. 7-21) at Exhibit A-3, paras. 4.8, 4.1 ("Supply Agreement").  The base price was fixed throughout the POR.  *Id*. at Exhibit A.  The copper metal price was also fixed and set by the LME as follows: [



              ] *Id*. at para. 4.8.  Copper metal is far and away the most significant input in the production of subject merchandise, accounting for approximately [    ] percent of the value of the final copper tube.  *See id.* at A-20.

Throughout the period of review ("POR"), Golden Dragon purchased copper and sold copper tubes based on the global copper price set on the LME.  *See, e.g.*, Golden Dragon Section C Response, Case No. A-570-964 (Mar. 15, 2013) (C.R. 22) at Exhibit C-1 (Printout of U.S. Sales Database); Golden Dragon Section D Response, Case No. A-570-964 (Mar. 25, 2013) (C.R. 24) at D-7 to D-8; *see also* the correlation summaries provided below, showing the monthly weighted average gross prices and LME prices, by control number, as calculated from Golden Dragon's U.S. sales database.  The metal price for the vast majority of POR sales (*i.e.*, the [            ] sales) thus was set as the [

              ].  Each invoice confirmed this pricing structure and contained the price of

copper with reference to the month of shipment and the corresponding LME price.  *See, e.g.*, C.R. 7-21 at Exhibit A-8 (Sales Documents for Sample Transaction); C.R. 22 at Exhibit C-1 (Printout of U.S. Sales Database); Golden Dragon Supplemental Section A Response, Case No. A-570-964 (May 13, 2013) (C.R. 29-33) at Exhibit SA-4 (Purchase Orders, Entry Summaries, and Invoices).  Golden Dragon submitted to the Department the LME prices for each month during the POR.  *See* C.R. 29-33 at Exhibit SA-6 (Documentation for Each Month of the POR). These monthly prices show fluctuations in the price of copper that track the different U.S. prices identified by the Department over time.  Golden Dragon thus submitted uncontested data regarding the price of copper as set by the LME and passed through to Golden Dragon's customer, as documented on its invoices.

### A.     The Department's Differential Pricing Methodology

The Department conducted its differential pricing analysis using a mechanical statistical analysis - the so-called Cohen's d test and a ratio test - then,

> if the value of sales to purchasers, regions, and time periods that pass the Cohen's d test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an average-to-transaction method to those sales identified as passing the Cohen's d test as an alternative to the average-to-average method, and application of the average-to-average method to those sales identified as not passing the Cohen's d test.

P.R. 126, *Prelim Decision Memo* at 13-14.  By adopting the differential pricing analysis and the Cohen's d test, the Department abandoned the *Nails* test it previously used to determine the method of dumping margin comparison.  The Department provided no explanation as to why such a percentage in the Cohen's d test supports consideration of the exceptional comparison method in general or in this review, given Golden Dragon's POR pricing.

To consider whether the exceptional comparison methodology (A-to-T) should be used, the Department "tests whether using an alternative method" "yields a meaningful difference in

NON-CONFIDENTIAL VERSION

the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method only." *Id*. at 14.  The Department considers the difference "meaningful" if there is a 25 percent relative change in the weighted-average dumping margin between the A-to-A method and the alternative.  *Id*.  The Department provides no explanation as to why a ratio difference between the margins calculated using the A-to-A method and the mixed method becomes "meaningful" at  25 percent.

### B.      The Department's Different Approaches in the Preliminary and Final Determinations

In the preliminary determination, the Department performed the differential pricing analysis described above and determined that a pattern of prices existed that differed significantly over a time period. *See* P.R. 126, *Prelim Decision Memo.* at 14 ("The results of the differential pricing analysis demonstrate that [      ] percent of Golden Dragon's export sales pass the Cohen's d test.  Thus, the value of U.S. sales passing the Cohen's d test is substantial (*i.e.*, between 33% and 66%) . . ."); *see also*, *Second Administrative Review of the Antidumping Duty Order on Seamless Refined Copper Pipe and Tube from the People's Republic of China: Analysis Memorandum for Golden Dragon Precise Copper Tube Group, Inc.*, Case No. A-570-964 (Nov. 14, 2013) (C.R. 104) ("*Preliminary Results Analysis Memo*") at 10 ("For Golden Dragon, we find that [      ] percent of its U.S. sales pass the Cohen's d test, and confirm the existence of a pattern of BPs or CEPs for comparable merchandise that differ significantly among purchasers, regions, or time periods.") The Department determined, however, that the A-to-A method appropriately accounted for these differences because the result of the margin comparison did not exceed 25 percent. *Id*.

By contrast, in the *Final Results*, the Department changed the time period group definition (from quarterly to monthly), which caused more Golden Dragon U.S. sales to "pass"

the Cohen's d test. *See* C.R. 118, *Final Results Analysis Memo*. at 2 ("As a result of the change

in time period group definition for Golden Dragon, we find that [     ] percent of its U.S. sales

pass the Cohen's d test, and confirm the existence of a pattern of EPs or CEPs for comparable

merchandise that differ significantly among purchasers, regions, or time periods.").   Then the

Department calculated Golden Dragon's weighted-average dumping margins using the A-to-T

method for U.S. sales which passed the Cohen's d test and the A-to-A method for sales which

did not pass (resulting in a 4.5 percent margin) and using the A-to-T method for all U.S. sales.

*Id*.   The Department provided its analysis of the selection of comparison method, which reads in

its entirety:

> The relative margin change between 3.55 percent and 4.50 percent is 26.55
> percent, and the Department considers relative margin changes that exceed 25
> percent to be meaningful.   Thus, the Department has determined to use the
> "mixed" alternative methodology comparison method where we apply the
> average-to-transaction method for U.S. sales which pass the Cohen's d test and
> the average-to-average method for U.S. sales which do not pass the Cohen's d
> test, in making comparisons of U.S. price and normal value for Golden
> Dragon's sales during the period of review.

*Id*. at 2-3.   The Department provided no further explanation of its decision to use this exceptional

approach.   In particular, the Department did not refer to targeted or masked dumping.   The

Department did not consider the effect of Golden Dragon's contractually-set prices or the LME

copper price fluctuations in its analysis.   Rather, the Department determined Golden Dragon's

weighted-average margin to be 4.50 percent for the POR based on the statistical analysis above.

## II.    Surrogate Country Selection and Factors of Production Values

In this review, the Department determined that Ukraine satisfied the threshold

requirement of being at a level of economic development comparable to China for purposes of

consideration as a surrogate country. *Second Administrative Review of the Antidumping Duty*

*Order on Seamless Refined Copper Pipe and Tube from the People's Republic of China:*

*Selection of a Surrogate Country,* Case No. A-570-964 (Nov. 14, 2013) (P.R. 134) ("*Prelim Surrogate Country Memo*") at 7.  In addition, the record contained data showing that Ukraine exported over 2.8 million kgs of copper tube under HTS heading 7411 in 2011.  *Id*. at 8, fn. 48. Based on the initial surrogate value submissions of the parties, the Department did not select Ukraine due to issues with the available data on the record – in particular, with the submitted Ukraine financial statement and with the copper slag and ash values.

Golden Dragon resolved these issues through a surrogate value submission of December 11, 2013, and in the Final Results, the Department agreed that the specific issues noted in the preliminary results has been corrected. P.R. 162, *Final Results Decision Memo* at 15 ("The Department agrees that the specific defects with the JSC Artemivskyy Plant 2011 Annual Report noted in the <u>Preliminary Results,</u> i.e., that the financial statements did not include the beginning portion of the annual report, which would include revenues, expenses, and an auditor's report or notes, have been remedied, and the information is now included on the record in the submitted JSC Artemivskyy Plant 2012 Annual Report.").

Even so, the Department noted other purported defects with the submitted Ukraine financial statements and ultimately selected Thailand as the surrogate country.

## SUMMARY OF THE ARGUMENT

The statute, 19 U.S.C. § 1677f-1(d)(1)(B), provides for an investigation-based, exceptional comparison methodology and does not permit the Department to broadly regard a price variation as a "pattern" sufficient to invoke the exception.  The provision's legislative history specifically uses the words "targeted dumping" in describing the behavior that the provision seeks to address.  The case law further – and consistent with the language of the statute - defines the relevant conduct as pricing behavior by which a respondent selectively sells below fair value.  In its final determination, the Department abandoned the inquiry into targeted or

masked dumping and applied an exceptional comparison methodology without identifying a pattern of differing prices that fall within the purview of the statute. The Department did this with no explanation regarding how such a practice comports with the statute, legislative history, or case law.

The Department's approach ignores undisputed evidence that Golden Dragon's U.S. prices were fixed by contract and not due to selectively targeting certain time periods for below fair value sales. The overwhelming components of Golden Dragon's reported prices - the fabrication charge and metal pricing formula - were fixed by contract with a single customer during the entire POR. The copper price was set by the LME, and Golden Dragon took no steps to adjust its prices over time or otherwise during the POR. Yet, with no explanation of how Golden Dragon's sales prices, as fixed by contract here, could demonstrate the type of selective selling that the statute envisions, the Department purported to find targeted dumping sufficient to invoke the exceptional methodology. Instead of following the statutory requirements, the Department undertook an exceptional comparison methodology based only on price variations outside of Golden Dragon's control that had nothing to do with targeting or masking unfairly low-priced sales. Accordingly, the Court should vacate the Department's erroneous conclusion that there was selective dumping by time period.

Regarding the Department's selection of a surrogate country and use of surrogate value data in this review, the Court should find that Ukraine is the proper choice. Given the quality of the Ukraine data on the record, including values for major inputs and a 2012 financial statement from a company that received no subsidies, experienced no loss, and made an identical product to that under review, Ukraine presented a more legally sound option than Thailand as the surrogate country. The Court should remand the case to the Department for further consideration

of Ukraine as the surrogate country and use the Ukraine inputs and the 2012 Ukraine financial statement to value the factors of production.

## ARGUMENT

**I.    The Department's Differential Pricing Analysis Is Contrary to Law and Is Not Supported By Substantial Evidence on the Record of this Review**

The Department's differential pricing analysis is both contrary to law and unsupported by substantial evidence of record.  Specifically, the Department's approach in the *Final Results* is contrary to the requirements of the applicable statute and regulations, conflicts with the plain meaning of "pattern" and "targeting," and is unsupported by the facts presented here, where Golden Dragon's U.S. prices during the POR were set pursuant to a contractual formula that did not change during the period.  In particular, the Department cannot lawfully ignore record evidence that establishes that Golden Dragon took no action to adjust or revise its U.S. prices, and thus engaged in no targeting or masking of sales.

The case law from this Court does not support the Department's actions in this case. *See, e.g., Timken Co. v. United States*, 968 F. Supp. 2d 1279, 1287 (Ct. Int'l Trade 2014) (noting confusion with the Department's explanations of its methodology based on the *Nails* test and upholding the Department's determination that the value and volume of targeted sales for each respondent was insufficient to considering using the A-to-T methodology).  Even in cases where the Court has upheld the Department's exceptional methodology, the respondent had taken some affirmative step during the review period that was construed as targeting prices by region, customer, or time period.  Golden Dragon did nothing of the kind during the POR, and as such, the Department has unlawfully ignored the statutory requirements for this exceptional approach. Further, the Department failed to explain (i) why the application of the Cohen's d test is appropriate in the context of targeted dumping analysis; (ii) why Cohen's d is more appropriate

than the *Nails* test that the Department previously employed in administrative reviews; or (iii) whether and how the Cohen's d methodology resolves the problems in the *Nails* test previously raised by this Court.

Golden Dragon respectfully requests that the Court order the Department to use the statutorily-required A-to-A method in calculating Golden Dragon's weighted-average dumping margin for all U.S. sales, without regard to its unsubstantiated finding of targeted dumping.

## A.      Legal Standard of Review

In reviewing a challenge to the Department's determination in an antidumping administrative review, the Court "shall hold unlawful any determination, finding or conclusion found … to be unsupported by substantial evidence on the record or not otherwise in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000); *see also*, *Carpenter Tech. Corp. v. United States*, 26 C.I.T. 830, 833 (Ct. Int'l Trade 2002).  Substantial evidence is measured by "the record as a whole," including the record which supports as well as that which "fairly detracts from the substantiality of the evidence." *Agro Dutch Indus., Ltd. v. United States*, 30 C.I.T. 799, 800 (Ct. Int'l Trade 2006), citing *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

"Commerce's findings must be reached by reasoned decision-making, including . . . a reasoned explanation supported by a stated connection between the facts found and the choice made." *Arch Chems., Inc. v. United States*, 33 C.I.T. 954, 956 (Ct. Int'l Trade 2009), quoting *Rhodia, Inc. v. United States*, 185 F. Supp. 2d 1343, 1349 (Ct. Int'l Trade 2001) (citations and quotations omitted).  "In order to effectuate review of the reasonableness of agency action, '{c}ourts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion.'" *AMS Assocs. v. United States*, 881 F. Supp. 2d 1374, 1379 (Ct. Int'l Trade 2012), citing *U.S. Steel*

*Corp. v. United States*, 621 F.3d 1351, 1357 (Fed. Cir. 2010), quoting *Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1369 (Fed. Cir. 1998).   "An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represent an unreasonable judgment in weighing relevant factors."  *Id.* at 1380, citing *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

In determining if the Department's interpretation of a statute is in accordance with law, the court applies a two-step analysis set forth by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  *Clearon Corp. v. United States*, 2014 Ct. Intl. Trade LEXIS 88, 51 (Ct. Int'l Trade July 24, 2014).  "First, the court examines whether 'Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress.'"  *Id.*, citing *Chevron*, at 842-43. "Second, if the statute is silent to the specific issue or the legislative intent is not clear, the court must determine 'whether the agency's answer is based upon a permissible construction of the statute.'" *Id.*, citing *Chevron*, at 843-44.

**B.    The Statute Requires a "Strategy" of Pricing Patterns that is not Present Here**

The intent of Congress is clear.  The statute at issue contemplates the application of the targeted dumping *exceptional* methodology in investigations and only where the statutory criteria are met.[2]  It provides, in relevant part

---

[2] The statutory provision does not govern administrative reviews, as noted by the Department. However, the Department has extended the exceptional methodology provision to administrative reviews in this case.

(B) **Exception**

The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if –

(i)     there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods time, and

(ii)    the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

19 U.S.C. § 1677f-1(d)(1)(B). The Department acknowledges this in its Final Determination:

In antidumping duty investigations, the Department examines whether to use the A-to-T method consistent with section 777A(d)(1)(B) of the Act. …   Although section 777A(d)(1)(B) of the Act does not strictly govern the Department's examination of this question in the context of administrative reviews, the Department nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in administrative reviews is, in fact, analogous to the issue in antidumping duty investigations.

P.R. 162 at 10-11.

The Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") serves as "an authoritative expression by the United States concerning the interpretation and application of the {URAA} … in any judicial proceeding in which a question arises concerning such interpretation or application{.}" 19 U.S.C. § 3512(d).  The SAA, in turn, ties the statutory exception to the concern of concealed or masked dumping through targeted dumping, a practice through which the exporter "may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."  SAA, H.R. Doc. No. 316, Vol. 1, 103d Cong., 2d Sess. (1994) at 842.   Congress added section 777A(d)(1)(B) of the Tariff Act as an exception to address this narrow and specific problem – namely, targeted dumping:

New section 771A(d)(1)(B) provides for a comparison of average normal values to individual export prices or constructed export prices in situations where an average-to-average or transaction-to-transaction methodology cannot account for a pattern of prices that differ significantly among purchaser, regions or time periods, i.e., **where targeted dumping may be occurring**. **Before relying on this methodology, however, Commerce must establish and provide an explanation** why it cannot account for such differences through the use of an average-to-average or transaction-to-transaction comparison.   In addition, the Administration intends that in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, **because small differences may be significant for one industry or one type of product but not for another.**

*Id*. at 843. (emphasis added).   The Senate Report refers to the same underlying purpose of

providing the Department with an option to examine targeted or masked dumping:

Section 229(a) codifies the requirements of Article 2.4.2. It adds to section 777A a new section 777A(d), which requires Commerce to determine whether the subject merchandise is being sold at less than its fair value by comparing weighted average normal values and weighted average export prices (or constructed export prices) or by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions. However, as provided for in Article 2.4.2, Commerce may compare weighted average normal values with the export prices (or constructed export prices) of individual transactions if there is a pattern of export prices (or constructed export prices) that differ significantly among purchasers, regions or periods of time and Commerce explains why such differences cannot be taken into account using the preferred methodologies described above.

**The exceptions are intended to permit Commerce to examine and take into account whether "targeted dumping" is occurring, which might otherwise be masked by the use of weighted average export prices** (or constructed export prices). The Committee expects that Commerce will collect and make available to interested parties that are parties to the proceeding the data necessary to establish whether any of the conditions have been met that would warrant determining the dumping margin by comparing weighted average normal values and transaction-specific export prices.

Senate Report 103-412, 103d Congress, 2d Sess. (Nov. 22, 1994) at 57.

The statute and the legislative history are clear: the Department used an exceptional

approach that applies in a limited context.   The Department must do more than identify lower

prices at some point in the review period.   The lower prices cannot be random and must instead

be distributed among the U.S. sales in a pattern of prices that "differ significantly."  The Oxford Dictionary defines "pattern" as "a regular and intelligible form or sequence discernible in the way in which something happens or is done."  *Concise Oxford English Dictionary,* 1051 (12th ed. 2011); *see also*, *Oxford English Dictionary*, found at http://www.oxforddictionaries.com/ definition/english/pattern, last viewed on November 25, 2014.   The legislative history also explicitly calls out "targeted dumping" as the conduct to be addressed.  This Court has discussed targeted dumping as a "strategy," indicating not only a purposeful behavior, but relevant to Golden Dragon, requiring *some* action on the part of the respondent.  *See U.S. Steel*, 637 F. Supp. 2d at 1216; *Borden, Inc. v. United States*, 4 F. Supp. 2d 1221, 1228 (Ct. Int'l Trade 1998).

In this regard, this Court has stated any statistical evidence of price variance will not do. *See, e.g., Borden,* 4 F. Supp. 2d at 1228.  Otherwise,

> *most* pricing would constitute targeted dumping, in that there is price variance along multiple dimensions in many markets.  Certainly, not all price variation, not even all statistically significant variation, results from targeted dumping.

*Id*.

In sum, a purposeful act on the part of the respondent is critical to the finding of a pattern of significant price differences that constitute targeted dumping.  Here, the Department does not identify a regular or discernible sequence in the way in which Golden Dragon's export prices differ among time periods and in a way that indicates targeted or masked dumping.  Golden Dragon's contract defines precisely how such pricing differences would occur – namely, by virtue of the variations in the LME published prices.  There is no record evidence to support a finding of a Golden Dragon pricing strategy that could come within the purview of the statute or the targeted dumping conduct the statute seeks to address.

Moreover, the Department rejected the view that it had to take the facts of this case into account and explain how its methodology comported with the statute's intent, given Golden Dragon's contractually-set prices.  The statute and legislative history require this explanation, and the Department's refusal to provide it is unlawful.  The facts demonstrate that any identified price variation during the POR had nothing to do with a strategy to selectively sell to Golden Dragon's major U.S. customer, in the one relevant region, differently during a given time period. The customer, the region, and the terms of sale were consistent throughout the POR.

Given the language of the statute and this record evidence, the Department's refusal to explain how Golden Dragon's sales fall under the statutory term "pattern" or how its approach meets the express legislative intent is unlawful.  The Court should so conclude.

**C.   The Department Unlawfully Found Targeted Dumping When the Purported Differences in U.S. Prices Resulted from the LME-Set Metal Price**

The Department found one form of alleged differential pricing in Golden Dragon's U.S. sales – by time period.  P.R. 126 at 10.  In so concluding, the Department refused to consider the record evidence of how Golden Dragon's U.S. selling prices are determined - namely under its Supply Agreement with [              ], under which the fabrication charge is fixed and the copper prices are set by formula tied to the LME.  The Department did not dispute that the record is replete with descriptions and back-up documentation establishing how Golden Dragon sets its U.S. prices.  *See* C.R. 7-21 at Exhibit A-8 (Sales Documents for Sample Transaction); C.R. 29-33 at Exhibit SA-6 (Documentation for Each Month of the POR). Instead, the Department claimed that it did not have to consider "external factors (such as LME prices), or consider a causal link (such as between LME prices and U.S. prices)."  P.R. 162, *Final Results Decision Memo.* at 12-13.  While the Department may not be required to investigate the causes of alleged price differences in all cases, it may not lawfully ignore undisputed evidence that demonstrates

how price differences occurred during the POR.   Put simply, where the record contains affirmative evidence that Golden Dragon did not engage in any targeting behavior, the Department cannot conclude otherwise.   In this case, the LME pricing entirely refutes the necessary prerequisite of a finding of targeted dumping.

A methodology that does not differentiate between allegedly targeted sales and the host of other potential causes of variations in price over time is unlawful and divorced from the factual record.   *See Borden*, 4 F. Supp. 2d at 1228.   Further, the Department refused to consider that the variations in Golden Dragon's price were not the result of Golden Dragon taking steps during the POR to update or adjust prices to keep up with costs.   Instead, the variation identified was the result of fluctuations in a third-party index price – a pass-through component of cost that did not either increase or decrease Golden Dragon's profits.   The record evidence establishes that the fabrication charge was fixed during the entire period and thus Golden Dragon's selling prices fluctuated solely due to changes in the LME price.   A finding of targeted dumping here directly conflicts with the definition of targeted dumping, as articulated by this Court.   *See Borden,* 4 F. Supp. 2d at 1228 ("{t}he concept of targeted dumping is that a company might not be able to, or might choose not to, use a dumping strategy toward a whole market **but might strategically focus on a more narrowly defined market**") (emphasis added).

Golden Dragon did not strategically focus on a more narrowly defined market or otherwise engaged in selective sales of any kind. To the contrary, the evidence demonstrates that did not occur.   *See U.S. Steel Corp. v. United States,* 637 F. Supp. 2d 1199, 1216 (Ct. Int'l Trade 2009) (defining targeted dumping as "selectively sell{ing} merchandise at less than fair value in certain product lines, to certain customers, at certain times of year.").   Golden Dragon does not seek a rule requiring the Department to explore the causes for price variations in every case

where cost is significant factor.  But here, where the variations found directly relate to a pass-through component of price to a single customer for which Golden Dragon has no control, a finding of targeted dumping is not only unlawful, it is devoid of the requisite factual support.

Golden Dragon confirmed the effect of this contractual pricing before the Department and presented the three graphs below, which show Golden Dragon's reported U.S. prices (as indicated by the triangles) and the LME sale specific prices (as indicated by the squares) for each month of the POR for the three largest volume control numbers sold in the U.S. during the POR, which account for more than [    ] percent of Golden Dragon's U.S. sales. *See* Golden Dragon Section C Response, Case No. A-570-964 (Mar. 15, 2013) (C.R. 22) at Exhibit C-1, U.S. Sales Database.  These graphs demonstrate that Golden Dragon's U.S. prices tracked the LME prices virtually identically and consistently throughout the POR.  This obvious linkage is confirmed by correlation statistics showing that changes in the total sales price are highly correlated (97.6% to 99.9%) with the LME price.  Thus, for every product, Golden Dragon's prices varied over the POR due to changes in the LME price.

[

NON-CONFIDENTIAL VERSION

]

The Department  provided no explanation for how prices determined by the market price for copper could satisfy a test of differential pricing over a time period.  The Department should recognize the demonstrable impact of the LME-set prices on the final U.S. prices that are set forth in the record.  To conclude that a time-period based pattern of differential pricing or targeted dumping exists on this record, without any consideration of the LME facts shown above and elsewhere in the record, would be unreasonable and certainly does not satisfy the case-by-case assessment called for under the policy. *See* P.R. 126 at 14.  The Department's determination goes beyond the "possibility of drawing two inconsistent conclusions from the evidence" and into the realm of finding only one possible conclusion: that Golden Dragon took no steps during this POR to selectively sell below fair value over time.  *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Since Golden Dragon's U.S. sales prices, absent the LME-induced fluctuations, do not satisfy the Cohen's d test, the Department committed legal error in concluding that an alternative methodology (namely, A-to-T, with zeroing) was proper.

Recently, the Court rejected an argument that the Department must consider a respondent's motive or intent behind pricing practices that supported a targeted dumping finding. *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States*, 990 F. Supp. 2d 1384 (Ct. Int'l Trade 2014).   In *Borusan*, the respondent's costs changed during the period of review due to the fact that the hot-rolled coil, a significant input of subject merchandise there, costs had changed over the months that the Department had found targeted dumping.   In response to these changing costs, the respondent had adjusted its U.S. prices to cover the costs.   The Court held that the Department did not have to investigate the motive behind the pricing behavior that led to the targeted dumping finding.   *See Borusan*, 990 F. Supp. 2d at 1389.

The facts here differ fundamentally from *Borusan*: Golden Dragon established how the LME market – and not Golden Dragon – determined the prices.   Unlike the respondent in *Borusan*,   Golden Dragon has made no adjustments or revisions of its U.S. prices to cover changing costs.   It has done nothing to change its pricing formula during this POR.   Golden Dragon does not seek a finding about its intent or motives.   While the *Borusan* Court declined to require the Department to investigate the reasons behind the pattern of targeted dumping, no investigation is necessary here.   *See Borusan*, 990 F. Supp. 2d at 1389.   Golden Dragon has supplied the Department with the record evidence confirming that agreed-upon, third-party prices set the substantial portion of Golden Dragon's U.S. prices.

The relevant regulations likewise provide no authority to adopt investigation methodology in reviews.   The regulations at 19 C.F.R. § 351.414(c)(1), call for the use of the A-to-A methodology unless the Department "determines another method is appropriate in a particular case."   However, it is well-settled that "{i}f the intent of Congress is clear, that is the end of the matter; for the court, as well as {an} agency, must give effect to the unambiguously

expressed intent of Congress." *Chevron U.S.A., Inc.  v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).    In this case, the Department's determination is at odds with the clear legislative history of the statute, which permits the exceptional use of an alternative methodology only to address targeted dumping, and it cannot rely on its implementation of its regulations to justify the use of a different approach.

The Department has provided virtually no explanation for the Cohen's d methodology, nor has it provided a reasonable explanation for how the value of U.S. sales is "substantial" under the methodology.  The Department merely concluded that the value of Golden Dragon's U.S. sales that pass the Cohen's d test is "substantial," defined as between 33 to 66 percent. Even assuming, *arguendo*, that the Cohen's d test is an appropriate test for determining whether a pattern of differing pricing exists in the context of the antidumping laws, an explanation of how such a test is met is required, how and why the *Nails* test has been abandoned, and how Golden Dragon's U.S. prices could be considered selectively set, particularly where the record demonstrates the manner in which Golden Dragon's U.S. prices are set.  Without such an explanation, the methodology cannot be lawfully applied.

II.     **The Department's Selection of Thailand as the Surrogate Country and Use of Thai Surrogate Value Data is Not Supported by the Law**

When the Department analyzes imports from non-market economies ("NMEs"), it values factors of production using "to the extent possible, the prices or costs of factors of production in one or more market economy countries that are – (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  When constructing normal value for a foreign producer in a NME country, the Department bases its determination on "the value of the factors of production utilized in producing the merchandise."  19 U.S.C. § 1677b(c)(1).  Because

valuing the factors of production does not capture certain items, such as manufacturing overhead, selling, general and administrative expenses, and profit, the Department calculates those surrogate values using ratios derived from the financial statements of one or more companies that produce identical or comparable merchandise in the surrogate market economy country. *See The Stanley Works (Langfant) Fastening Sys. Co. v. United States*, 964 F. Supp. 2d 1311, 1332 (Ct. Int'l Trade 2013); 19 C.F.R. § 351.408(c)(4).

To determine which data constitutes the "best available information," the Department generally looks to the criteria set forth in its "Policy Bulletin 04.1," known as the NME Surrogate Country Policy Bulletin. Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004). The Policy Bulletin explains

> In assessing data and data sources, it is the Department's stated practice to use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data.

*Id*. at "Data Considerations."

In this review, the Department determined that Ukraine satisfied the threshold requirement of being at a level of economic development comparable to China for purposes of consideration as a surrogate country, and the record evidence shows that Ukraine is a significant exporter of relevant merchandise. P.R. 134, Prelim Surrogate Country Memo at 8, fn 48.

Based on the initial surrogate value submissions of the parties, the Department did not select Ukraine due to noted issues with the available data on the record – in particular, with the submitted Ukraine financial statement and with the copper slag and ash values. Golden Dragon resolved these issues through a surrogate value submission of December 11, 2013, and the publicly-available data on the record for Ukraine was then the most complete and best available

information for valuing the factors of production.   The Department erred in not selecting Ukraine.

### A.      Ukraine was the Most Appropriate Surrogate Country

In this review, the Department initially determined that six countries – Colombia, Costa Rica, Indonesia, the Philippines, South Africa, and Thailand – are each at a comparable level of economic development as China.  *Id*. at 2. The Department later concluded that Ukraine's 2011 per-capita GNI of $3,130 also falls into the range of the GNIs for the six identified countries (ranging from $7,660 to $2,210) and therefore found that Ukraine was also at a level of economic development comparable to that of China under the statute.  *Id*. at 7.  Moreover, the Department relied on export data as a proxy for overall production data in this review.  It noted that Golden Dragon submitted data for the record of this review showing that Ukraine exported over 2.8 million kgs of copper tube under HTS heading 7411 in 2011.  *Id*. at 8.

Once the Department identifies countries that are both economically comparable to China and significant producers of comparable or identical merchandise, then it selects a primary surrogate country based upon whether the data for valuing FOPs are available and reliable. Here, the Department preliminarily did not select Ukraine as the surrogate country, explaining that the record contained only the 2011 Ukraine financial statement of JSC Artemivskyy Plant, which the Department found to be incomplete, and that no values for copper slag and ash had been provided.  *Id*. at 9.  Golden Dragon supplemented its surrogate value submission in December 2013 to include an additional Ukraine financial statement from 2012 that is complete and more contemporaneous with the period under review than the Thai financial statement that the Department relied upon.  *Id*. at 9.  Golden Dragon also submitted import data for copper slag/ash that can be used to value those by-products.  *Id.* at Exhibit 2 (Financial Ratios, Ash and Slag Worksheet).   As shown in that submission, Golden Dragon followed the Department's

standard practice and inflated the Ukraine import value for copper slag/ash to be concurrent with the POR. Slag and ash represent a miniscule share of the total cost. The Department acknowledged that the original deficiencies that it had noted in the preliminary results were resolved. P.R. 162, Final Results Decision Memo. at 15.

Next, the Department reviews the public information submitted on the record to determine whether the market economy company is a producer of comparable merchandise. 19 U.S.C. § 1677b(c)(4)(B). Here, the Department read on the JSC Artemivskyy Plant translated financial statements that the plant engages in "copper production," and determined that the JSC Artemivskyy Plant is not a producer of identical or comparable merchandise. P.R. 162, Final Results Decision Memo., at 15. On the contrary, the JSC Artemivskyy financial statements show throughout, including on page one, that the company is a manufacturer of copper products that engages in "non-ferrous metals processing." Golden Dragon Surrogate Value Submission, Case No. A-570-964 (Dec. 11, 2013) (P.R. 142-144) at Exhibit 1 (Financial Statement). Thus, the Department's unsupported conclusion that JSC Artemivskyy Plant produces copper is contrary to the record and its conclusion that the JSC Artemivskyy Plant is not a producer of comparable merchandise is not in accordance with law.

Tthe Department continued to select Thailand as the primary surrogate country in the *Final Results*. This result is legally unsupportable on the record, because Ukraine, like China, has a broad production base, and the reliable data submitted include a financial statement that covered 10 months of the POR. The financial statements for Thailand, by contrast, only cover two months of the POR. *See* Import Administration Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1, 2004).

**B.      The Department Should Have Relied on the Best Available Information to Calculate Financial Ratios: the JSC Artemivskyy Plant 2012 Financial Statement**

The Department considers several factors including the specificity, contemporaneity, and quality of data, when selecting the best available surrogate value information.  *See* Department Policy Bulletin 04.1: Non-Market Surrogate Country Selection Process (Mar. 1, 2004).   The Department weighs available information with respect to each input value and makes a product-specific and segment-specific decision as to what the best surrogate value is for each input.  P.R. 134, Prelim Surrogate Country Memo at 8.  With respect to the selection of financial statements, the Department noted that it prefers financial statements from companies that produce identical merchandise over companies that produce comparable merchandise.

As discussed above, the JSC Artemivskyy Plant 2012 financial statement is the best available information with which to calculate the financial ratios because (i) the company is a producer of copper products and (ii) importantly, the financial statement covers 10 months of the POR, as opposed to the Thai financial statement, which covers only two months.   The submitted Ukraine financial statement further provides no indication of subsidization. In sum, the 2012 Ukraine financial statement provides a better alternative to the Furukawa Metals financial statement that the Department used.  Ukraine also has significant imports of the primary input consumed in the production of copper pipe and tube – namely, copper cathodes – as well as imports of all other materials used in the production and packing of subject merchandise.  The contemporaneous values for all inputs were provided in the surrogate value data submitted by Golden Dragon. *See* P.R. 142-144.

### i. Even Using the Thai Data, the Department Double-Counted Certain Expenses.

The Department calculated the overhead, SG&A, and profit ratios using the financial statement for Furukawa Metal (Thailand) Public Company Limited. *See* P.R. 162, Final Results Decision Memo at 16. After the preliminary results, Golden Dragon demonstrated that the Department misclassified certain personnel expenses as SG&A rather than labor. These personnel expenses contained in the Furukawa financial statements were therefore double-counted with Golden Dragon's reported direct labor. As discussed in the decision memorandum earlier this year in the case of *Drawn Stainless Steel Sinks from China*, for cases where Thailand is selected as the surrogate country, SG&A labor costs should be classified as direct labor expenses in keeping with the Department's "longstanding practice to avoid double-counting." *Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Drawn Stainless Steel Sinks from the People's Republic of China*, Case No. A-570-983 (Feb. 19, 2013) at 15. Specifically, "because the NSO data include all labor costs, the Department has treated itemized SG&A labor costs in the surrogate financial statements as a labor cost rather than an SG&A expense, and we have excluded those costs from the surrogate financial ratios." *Id.* Thus, to avoid double-counting SG&A labor, as in the *Sinks* decision, the Department should have reclassified the itemized personnel expenses reported in Furukawa's financial statement and recalculated the financial ratios.

### ii. The Department Did Not Base the Surrogate Labor Cost on the Most Industry-Specific Data Available.

In the Preliminary Results, the Department valued Golden Dragon's labor using Thai 2007 Industrial Census data published by the Thailand National Statistics Office (NSO) for the industry category 2899, "Manufacture of other fabricated metal products not elsewhere classified." *See* Surrogate Value Memo at 5 and Exhibit 4. As indicated by the designation "not

elsewhere classified" this is clearly a basket category for fabricated products and is not representative of Golden Dragon's operations as a producer of copper, *i.e.*, non-ferrous, tubes produced through a continuous cast and roll process whereby Golden Dragon melts copper cathode and directly casts the molten metal into copper tubes.  Moreover, section 773( c)(1) of the Act directs the Department to use the best information available.  In determining the best information available, the Department considers five factors, one of which is product specificity. In the current proceeding, in order to most closely match the Thai labor data with the specific copper tube products cast by Golden Dragon, the best information available was the more specific labor cost reported in the same NSO database for category 2732, casting of non-ferrous metals. The total labor costs for this more specific category, *i.e.*, wages, overtime, fringe benefits, employers' contribution, etc., was on the record and should have been used in the *Final Results*.

## CONCLUSION

The Department has no basis in law or fact to conclude that Golden Dragon engaged in targeted dumping during the POR.  Golden Dragon does not request that the Department undertake a full and complete causal analysis regarding how and why companies set their U.S. prices. However, where, as here, the respondent takes no affirmative steps to adjust its U.S. prices during the POR, and where record evidence plainly establishes that a third-party set price is behind the apparent "pattern" in price differences, Golden Dragon submits that the Department's analysis cannot lawfully stand.   There is no evidence of targeted dumping here.  In addition, given the statutory and regulatory framework, the Department lacks the authority to engage in the differential pricing analysis and should have applied the A-to-A comparison methodology in this administrative review.

Further, the most contemporaneous data available to value surrogate factors of production is Ukraine, and the Court should remand the *Final Results* to the Department with instructions to select Ukraine as the surrogate country for this review.

Respectfully submitted,

*/s/ Kevin M. O'Brien*
Kevin M. O'Brien
Christine M. Streatfeild
Yi Fang

*Counsel for Hong Kong GD Trading Co., Ltd, Golden Dragon Holding (Hong Kong) International, Ltd., GD Copper Cooperatief UA, Golden Dragon Precise Copper Tube Group, Inc., and GD Copper (U.S.A.)*

## <u>Certificate of Compliance with Chambers Procedure 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 8,335 words, exclusive of the table of contents, table of authorities, and certificate of counsel, and therefore complies with the word limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By: <u>*/s/  Kevin M. O'Brien*      </u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 25th day of November, 2014, a copy of the foregoing document was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: <u>*/s/ Kevin M. O'Brien*</u>
Kevin M. O'Brien