Slip Op. 15 - 89

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| GOLDEN DRAGON PRECISE COPPER TUBE GROUP, INC., HONG KONG GD TRADING CO., LTD., GOLDEN DRAGON HOLDING (HONG KONG) INTERNATIONAL, LTD., and GD COPPER (U.S.A.) INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| UNITED STATES, | : | Consol. Court No. 14-00116 |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| CERRO FLOW PRODS., LLC, WIELAND COPPER PRODUCTS, LLC, MUELLER COPPER TUBE PRODUCTS, INC, and MUELLER COPPER TUBE CO., INC., | : | |
| | : | |
| Intervenor-Defendants. | : | |

## OPINION AND ORDER

[Remanding second (2011-2012) administrative review of antidumping duty order on seamless copper pipe and tube from the People's Republic of China for further proceedings.]

Dated:  August 19, 2015

*Kevin M. O'Brien* and *Yi Fang*, Baker & McKenzie, LLP, of Washington DC, for the plaintiffs.

*Jennifer E. LaGrange*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of Counsel on the brief was *Daniel J. Calhoun*, Senior Attorney, Office of the Chief

Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Thomas M. Beline*, *Jack A. Levy*, and *Jonathan M. Zielinski*, Cassidy Levy Kent (USA) LLP, of Washington DC,  for the defendant-intervenors.

Musgrave, Senior Judge:  This consolidated case represents separate actions filed by nominal plaintiffs ("Golden Dragon" or "GD") and nominal intervenor-defendants ("Mueller") challenging aspects of the second (2011-2012) administrative review compiled by the defendant United States Department of Commerce, International Trade Administration ("Commerce" or "the Department") *sub nom*. *Seamless Refined Copper Pipe and Tube From the People's Republic of China* ("PRC"), 79 Fed. Reg. 23324 (Apr. 28, 2014), subsequently amended, 79 Fed. Reg. 47091 (Aug. 12, 2014).  In addressing Golden Dragon and Mueller's separate motions for judgment, the court concludes that remand is necessary in accordance with the following.

I. *Jurisdiction and Standard of Review*

Jurisdiction is here pursuant to 28 U.S.C. §1581(c) and 19 U.S.C. §1516a(a)(2)(B)(iii), as previously alluded.[1]  The court will uphold an administrative determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i).  This standard requires that Commerce thoroughly examine the record and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (internal quotation omitted).

---

[1]  *See* Slip Op. 14-85 at 9-10 (July 18, 2014).

II.  *Golden Dragon's USCIT Rule 56.2 Motion*

A.  Background

Further to *Seamless Refined Copper Pipe and Tube From Mexico and the PRC*, 75 Fed. Reg. 71070 (Nov. 22, 2010) (antidumping duty order), Commerce initiated the second administrative review of the antidumping duty order.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 Fed. Reg. 77017, 77025 (Dec. 31, 2012).  Commerce selected Golden Dragon as a mandatory respondent.  PDoc 13 at 5.

Via *Seamless Refined Copper Pipe and Tube from the PRC*, 78 Fed. Reg. 69820 (Nov. 21, 2013) (*inter alia* preliminary rev. results) and an accompanying preliminary decision memorandum ("*PDM*"), PDoc 126, (together, "*Preliminary Results*"), for its primary surrogate country, Commerce preliminarily selected Thailand because: (1) it met both criteria set forth in section 1677b(c)(4) above; (2) it provided the most specific, contemporaneous, and high-quality data of all potential surrogate countries; and (3) it offered financial statements that conformed to criteria that Commerce uses when choosing the best information available -- *i.e.*, "financial statements that are complete, publicly available, and contemporaneous with the [period of review ("POR")]." *Id.*; *see also* Prelim. Surrogate Country Memo at 6-10, PDoc 134.  Commerce did not opt for the Ukraine because Golden Dragon did "not provide[ ] sufficient information to demonstrate that Ukraine [was] a reliable source of publicly available surrogate data," and the record "contain[ed] no Ukrainian data to value copper slag and ash."  PDoc 134 at 9.

Commerce calculated a preliminary weighted-average dumping margin of 3.55 percent for Golden Dragon using the average-to-average (A-A) comparison methodology for Golden

Dragon's U.S. sales. *See Preliminary Results*, 78 Fed. Reg. at 69821; *PDM* at 12-14.  In deciding

whether to use the default A-A methodology or an alternative methodology, *e.g.*, average-to-

transaction (A-T), to calculate Golden Dragon's dumping margin, Commerce conducted its

differential pricing analysis across quarterly periods of the POR.  *Id.*

The differential pricing analysis involved two stages. *Id*. at 13.  In the first stage,

Commerce determined whether there was a pattern of prices that differed significantly by purchaser,

region, or time period by: (1) applying the "Cohen's *d*" test to compare the mean of a test group of

net prices (*e.g.*, Golden Dragon's net prices in one quarter) and the mean of a comparison group of

net prices (*e.g.*, the export prices or constructed export prices of comparable merchandise in the other

quarters) and (2) applying the ratio test to assess the extent of the significant price differences for

all sales as measured by the Cohen's *d* test.  *Id*.  Because both tests together demonstrated the

existence of a pattern of prices that differed significantly by time period, Commerce proceeded to

the second stage.  *Id*. at 14.

In the second stage, Commerce determined whether the A-A methodology could

account for such price differences by testing whether application of the alternative A-T methodology,

as opposed to the A-A methodology, yielded a meaningful difference in the weighted-average

dumping margin.  *Id*.  Commerce concluded that: (1) "38.9 percent of Golden Dragon's export sales

pass the Cohen's *d* test"; and (2) this value of total sales supported consideration of applying the

alternative average-to-transaction (A-T) method to those sales identified as passing the Cohen's *d*

test; but (3) after comparing the weighted-average dumping margins calculated using the A-A and

alternative methods, "there was not a meaningful difference." *Id*.  Thus, for its preliminary

determination, Commerce used the default A-A methodology.  *Id*.

       Because the PRC is a non-market economy country, Commerce was required to base

normal value on the value of factors of production used in producing the merchandise, referencing

the best information available in surrogate market economy countries that were: (1) at a level of

economic development comparable to that of the PRC and (2) significant producers of comparable

merchandise.  *See PDM* at 11, discussing 19 U.S.C. § 1677b(c)(1) & (4).  For this matter, Commerce

selected Thailand as the primary surrogate country to value the factors of production.  *Id*., citing 19

C.F.R. §351.408(c)(2).

       Both Golden Dragon and Mueller submitted case and rebuttal briefs addressing the

preliminary results.  PDocs 148-50, 151.  Relevant here, Golden Dragon argued that: (1) Commerce

should have selected Ukraine, rather than Thailand, and the surrogate value country; (2) Commerce's

differential pricing analysis was flawed because the primary elements of Golden Dragon's U.S.

prices (the fabrication charge and metal pricing formula) were fixed by contract, Golden Dragon did

not intend to engage in targeted dumping, and Commerce should have inquired into the "underlying

reasons" or "causes" for price fluctuations rather than simply apply the differential pricing analysis;

and (3) Commerce should have used monthly prices, rather than quarterly prices, in its differential

pricing analysis because Golden Dragon priced its products based on monthly London Metal

Exchange prices.  PDocs 148-50 at 4-19.  For its part, Mueller challenged the ocean freight surrogate

values selected by Commerce.  PDoc 151 at 8-10.

Commerce published the final results in April 2014.  79 Fed. Reg. at 23324-26; PDoc 176.  Commerce continued to find that Thailand was the appropriate surrogate value country.  Issues and Decision Memorandum for the Final Results ("*IDM*") at 14-16, PDoc 162.  Commerce observed that Golden Dragon had corrected the deficiencies with the Ukrainian data that had been identified in the preliminary decision, but then Commerce noted several other defects with the Ukrainian financial statements, concluding that Thailand is a more appropriate selection.  *Id*. at 15.

Concerning the issue of targeted dumping, Commerce agreed with Golden Dragon that the "contractually-determined monthly fluctuation in copper prices" created "a logical basis for grouping sales by month when examining whether there are prices that differ significantly by time periods."  *Id* at 13-14.  Commerce did not, however, agree that it was required to consider the reasons for price fluctuations.  Commerce thus again applied its differential pricing analysis, this time on a monthly basis, and concluded that: (1) "51.2 percent of Golden Dragon's export sales pass the Cohen's *d* test"; (2) this value of total sales supported consideration of applying the A-T method to those sales identified as passing the Cohen's *d* test; and (3) after comparing the weighted-average dumping margins calculated using both the A-A and this alternative method, "the change in the two results exceed[ed] the 25 percent threshold which the Department considers meaningful."  *Id*. at 3.  Commerce then used the mixed alternative method, in which it applied the A-T method for U.S. sales that passed the Cohen's *d* test and the A-A method for U.S. sales that did not pass the Cohen's *d* test.  Final Results Analysis Memo, PDoc 161 at 2-3.  Using this alternative method, Commerce calculated a dumping margin of 4.50 percent for Golden Dragon.  *Id*.; *see also* 79 Fed. Reg. at 23325.

After Golden Dragon and Mueller filed their separate complaints in this court and the cases were consolidated, Commerce's motion to for voluntary remand in order to evaluate and correct for ministerial errors was granted.   Order of July 18, 2014, ECF No. 34.   Commerce published amended final result on August 12, 2014, concluding that it had inadvertently miscalculated Golden Dragon's freight distances.   79 Fed. Reg. at 47091-92, PDoc 173.   After making corrections, Commerce calculated a final dumping margin for Golden Dragon of 4.48 percent.   PDoc 171 at 5.

## B.  Analysis

Golden Dragon challenges (1) Commerce's selection of Thailand as the surrogate country based on the data therefor, and (2) Commerce's determination that Golden Dragon engaged in targeted dumping and the determination to apply "mixed" alternative methodology in calculating Golden Dragon's weighted-average dumping margin.[2]

### 1.  Selection of Thailand as Surrogate Country

Before Commerce, Golden Dragon argued that the Ukraine provides the most complete and product-specific data of record, in particular on the basis of the annual report of Joint Stock Company Artemivskyy Plant Treated Colored Metals " ("JSC Artemivskyy"), which produces copper tubes that are identical in function and dimension to the copper tubes produced by Golden Dragon.   Prelim. Surrogate Country Memo at 3, PDoc 134.   Golden Dragon also argued the record contained complete data for Thailand, including data it apparently submitted for Furukawa Metal

---

[2]  Golden Dragon's reply brief does not address Commerce's response to Golden Dragon's original challenges to Commerce's calculation of Thai financial ratios and labor rates; accordingly, for purposes of this opinion the court will treat those challenges as abandoned.  *See*, *e.g.*, *NMB Singapore Ltd. v. United States*, 557 F.3d 1316 1326 n.13 (Fed. Cir. 2009).

Consol. Court No. 14-00116                                                                 Page 8

(Thailand) Public Company Limited ("Furukawa"), a Thai producer of merchandise identical to the

subject merchandise.  *Id*. at 4.  Mueller argued for South Africa and against the Furukawa Metals

financial statement on the ground that it is Commerce's policy not to give more weight to financial

statements with a greater similarity of production experience if those financial statements shows

evidence of countervailable subsidies.  *Id*.

       For the *Final Results*, Commerce selected Thailand as the primary surrogate country

and t valued SG&A and profit using the audited financial statements for Furukawa for the year

ending December 2011.  Commerce found from those statements that Furukawa was granted certain

"promotional privileges" by the Thai government under its Investment Promotion Act ("IPA") and

Commerce acknowledged that the IPA has been found countervailable, but it found that the language

in the Furukawa financial statements "only suggest that such privileges were available to Furukawa",

that "[t]here is no indication in the Furukawa financial statements that Furukawa received a

countervailable benefit during the fiscal year", and that this was not a sufficient basis for excluding

the financial statement as a source for calculating financial ratios.  *IDM* at 10.  *Id*.

       In a bit of a role reversal, Golden Dragon now argues Commerce's selection of

Thailand is erroneous, that the Ukraine data on the record are complete, untainted by countervailable

subsidization, and more contemporaneous with the period of review than that of the Thai selected

data, while Mueller argues in support of the Furukawa Metals financial statement.

       a.  The Furukawa (Thai) Financial Statement

       With respect to Commerce's selection of the Thai data as preferable to the Ukrainian

data, Golden Dragon argues that Commerce and Mueller point to "immaterial" aspects of the JSC

Artemivskyy financial statement, *see infra*, that should be regarded in the context of the fact that the Furukawa financial statement covers only two months of the POR (versus the JSC Artemivskyy financial statement covering 10 months of the POR) and in the context of the fact that the Furukawa financial statement shows "significant evidence of subsidization" as argued by Mueller before Commerce.

First, pointing to Import Administration Policy Bulletin 04.1, "Non-Market Economy Surrogate Country Selection Process" (Mar. 1, 2004), which states that "period-wide price averages . . . that are contemporaneous with the period of investigation or review" should be utilized, while Golden Dragon admits that the Thai data "may satisfy this criteria", it argues that the Ukraine data are more contemporaneous and thus the best available information. For support, Golden Dragon points to *Sebacic Acid From the PRC*, 65 Fed. Reg. 49537 (Aug. 14, 2000) (final rev. results), and accompanying issues and decision memorandum ("I&D Memo") at cmt. 10 (castor oil and seed valuation) as one (among unspecified other) determinations that have found that a larger coverage range is preferable for surrogate value analysis. In that determination, Commerce "indicated its preference for using data that covered a ten-month period instead of a three-month period." GD Reply at 11, referencing *id*.

Second, Golden Dragon argues that the agency's finding that the Furukawa financial statement does not indicate receipt of a countervailable benefit during the fiscal year is inconsistent with the agency's preference for using financial statements that have not benefitted from countervailable subsidies in surrogate value analysis. *Id*. at 12, referencing *Chlorinated*

*Isocyanurates From the PRC*, 75 Fed. Reg. 70212 (Nov. 17, 2010) (final 2008-2009 rev. results) ("*Chlor-Isos*"), and accompanying I&D Memo at cmt. 3.

Commerce acknowledged in *Chlor-Isos* that "it is . . . the Department's practice to reject the financial statements of a company that we have reason to believe or suspect may have benefitted from countervailable subsidies, particularly when other sufficient, reliable, and representative data are available for calculating surrogate financial ratios", *id*., and the Indian financial statement considered in that case provided clear indication of countervailable subsidies (specifically, a clear explanation of how "Capital Subsidy" funds are accounted for among the relevant company's financial statements), and Commerce indicated that it has found "Capital Subsidy" to be a countervailable benefit program. *See Clearon Corp. v. United States*, 35 CIT ___, ___, 800 F. Supp. 2d 1355, 1360-61 (2011).

In the matter at bar, Golden Dragon points out that the financial statements for Furukawa indicate that the company "has been granted privileges by the Board of Investment relating to the manufacturing of seamless copper tube". GD's SV Cmts (Mar. 29, 2013), PDoc 42 at Ex. 13, p. 35. Commerce seems to have agreed that such privileges would amount to a countervailable subsidy, but it concluded that while "such benefits were available to Furukawa…[t]here is no indication in the Furukawa financial statements that Furukawa *received* a countervailable benefit during the fiscal year", Prelim. Surrogate Country Memo at 10 (italics added), however Furukawa's financial statements further provide that the company "has been granted additional promotional privileges to extend a period of exemption from payment of import duty on raw materials and

equipment *necessary for the Company's operation for export* until January 2013."  GD's SV Cmts

at Ex. 13, p. 35 (Note 25) (italics added).

       That statement seems plain enough.  Commerce's conclusion, above, is therefore in

apparent contrast with Golden Dragon's observation on the Furukawa statement, also above, which

therefore requires remand for further explanation or reconsideration, as appropriate.

      b.  The JSC Artemivskyy (Ukraine) Financial Statement

       Golden Dragon also argues the JSC Artemivskyy financial statements are free of

indication of countervailable subsidies and provide better contemporaneity than the Furukawa

financial statement.  *See* GD's SV Submission (Dec. 11, 2013), PDocs 142-144 at Ex. 1 (JSC

Artemivskyy 2012 Financial Statement); *IDM* at 15.  Commerce and Mueller maintain it is unclear

whether JSC Artemivskyy is a producer of comparable merchandise. Def. Resp. at 23; Def-Ints.

Resp. at 25; *IDM* at 14-15.  Specifically, Commerce found that "[t]he JSC Artemivskyy Plant

financial statements indicate only that the JSC Artemivskyy Plant engages in "copper production'[3]"

and that it cannot "speculate on the precise meaning of this description of the company's commercial

activity."  *IDM* at 15.

       The court does not understand what level of precision is required here.  Apart from

the translated name(s) of the relevant Ukrainian company, indicated as "Artyomovsk Non-Ferrous

Metals Processing" or "Artemivskyy plant-treated ferrous metals", a financial statement Note plainly

---

[3]  Gold Dragon would have better assisted its case if it had simply presented copies of JSC Artemivskyy's own description of itself, *e.g.*, from its website, if any.  Be that as it may, as Commerce indicated, the only instance of "copper production" appears on the document's first page of the English translation, but this appears to be the general economic activity class into which SMIDA (*i.e.*, Agency for Ukraine's Stock Market Infrastructure Development) classifies JSC Artemivskyy, not a declaration by JSC Artemivskyy as to its economic activity.

describes inventory amounts for "finished products in ingots, round and flat rolled products, sanitary fittings and other". The *IDM* does not address this, and therefore there is no apparent consideration of it. Whether it can be concluded therefrom that JSC Artemivskyy is not a producer of comparable merchandise there is no indication in the *IDM*, and therefore to that extent the court is unable to determine whether substantial evidence supports Commerce's conclusion.

According to Golden Dragon, Commerce "routinely" relies on financial statements of companies that produce similar or comparable merchandise when those financial statements represent the best available information. GD Reply at 14, referencing Policy Bulletin 04.1. Nonetheless, Commerce and Mueller argue that concerns remain with respect to the JSC Artemivskyy financial statement. Def. Resp. at 23-24; Def-Int. Resp. at 24-26.

Mueller, for example, highlights the fact that the company's own auditors stated they could not vouchsafe the integrity of the statements. Golden Dragon disagrees, arguing that Commerce does not require audited financial statements for surrogate value calculations or unqualified auditor opinions. GD Reply at 14, referencing *Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from the Russian Federation*, 64 Fed. Reg. 38626 (Jul. 19, 1999) ("it is not required that the financial statements be audited.").

More concretely, Golden Dragon argues that the auditor's report qualified its opinion with a note stating that it "was not able to observe the inventory of existing fixed assets, reserves, other non-current assets and liabilities since the inventory took place before the appointment of our auditors" but that the report adds that the auditors "performed procedures to obtain alternative and

appropriate audit evidence regarding the quantity of fixed assets." *Id.*, referencing PDocs 142-44 at

Ex. 1.  In other words, according to Golden Dragon, the report concludes that while the auditors were

not able to observe the inventory, they were still able to perform an appropriate audit using

alternative evidence, and that at most the report provides that "certain minor [deviations] may exist

in quantities of fixed assets."  *Id*.  As such, Golden Dragon argues, JSC Artemivskyy's qualified

audit opinion is preferable to the subsidized Thailand financial data not render the Ukrainian data

deficient and does not impact concluding that it is the best available information.

    Similarly, with respect to Commerce's and Mueller's argument that  the Ukraine data

is deficient because the information used to value copper ash and slag predated the period of review

by four years (Def Resp. at 24; Def-Int. Resp. at 26-27), Golden Dragon argues it is "clear" from the

underlying record that copper slag and ash are "minor" inputs to the manufacturing of copper tubes,

with minimal effect on the calculation of total manufacturing cost compared to the main inputs --

raw copper, labor, electricity, and water -- and that the copper ash and slag data do not constitute a

credible deficiency in the Ukraine data.

    Golden Dragon's rebuttal directly addresses only three of the four "deficiencies"

Commerce identifies, the fourth being that the auditor stated it was unable to perform alternative

procedures on all qualified balance sheet areas because of "the nature of the accounting records" and

Commerce relies on its inability to seek clarification from the Ukrainian producer about these

concerns.  Def. Resp. at 24.  Whether that concern is subsumed in and addressed by Golden Dragon's

points, above, the court is not in a position to discern, but in view of the foregoing matters, requiring

further consideration or explanation on which financial statement provides the "best" data, Golden

Dragon is capable of commenting further on the issue on remand.

    2.  Application of "Mixed" Alternative Methodology

        Golden Dragon also argues Commerce unlawfully considered only price variance as

sufficient to trigger the exceptional methodology and ignored that the variances measured by

Cohen's *d* had nothing to do with targeted dumping.   Golden Dragon argues that the pricing

differences here had nothing to do with targeted dumping; that where a respondent takes no steps

to adjust, revise, or in any way alter its prices during the period of review, a finding of targeted or

masked dumping is unsupported by the record; that it is unlawful for Commerce to take the position

that the contractually-set pricing tracks spot prices on the London Metals Exchange is "irrelevant"

to the selection of the A-A or A-T comparison methodology; and that the record is "devoid" of an

explanation as to how a pattern of price differences could not be accounted for with the A-A

methodology, as required by 19 U.S.C. §1677f-1(d)(1)(B)(ii).

        For support, Golden Dragon points to *Borden, Inc. v. United States*, 22 CIT 233, 4

F. Supp. 2d 1221, 1228 (1998), *rev'd on other grounds*, 7 Fed. Appx. 938 (Fed. Cir. 2001), wherein

the court stated that "not all price variation, not even all statistically significant variation, results

from targeted dumping."   Whether this court could agree with that statement, the Court of Appeals

for the Federal Circuit recently confirmed that 19 U.S.C. §1677f-1(d)(1)(B) "does not require

Commerce to determine the reasons why there is a pattern of export prices for comparable

merchandise that differs significantly among purchasers, regions, or time periods, nor does it

mandate which comparison methods Commerce must use in administrative reviews." *JBF RAK LLC*

*v. United States*, 790 F.3d 1358 (Fed. Cir. 2015).  *See also Borusan Mannesmann Boru Sanayi ve*

*Ticaret A.S. v. United States*, ___ Fed. App'x ___, No. 2014-1744, 2015 WL 3875488 (Fed. Cir.

June 24, 2015) (finding Commerce's interpretation of section 1677f-1(d)(1)(B) "is based on a

permissible construction of the statute", quoting *Chevron U.S.A., Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837, 843 (1984)).

　　　　　Golden Dragon argues it is not requesting that Commerce consider intent in setting

U.S. prices but should weigh the fact that it, Golden Dragon, did not "set" or "adjust" its U.S. sale

prices during the POR.  And yet, it would seem inescapable that for Commerce to consider that

prices were *not* "set pursuant to a targeted dumping strategy"[4] would involve consideration of intent,

*i.e.*, of "strategy".  The lion's share of Golden Dragon's U.S. prices that were "established" by the

externality of the published London Metals Exchange (LME) spot prices according to formula(s) to

which Golden Dragon contractually agreed, on what appears to be requirements contract(s), resulted

in a "pattern" of price fluctuations over the course of the POR that "differ[ed] significantly among

purchasers, regions, or periods of time".  Unfortunately, this fulfills the first requirement of resorting

to the alternative A-T price-comparison methodology.  *See* 19 U.S.C. §1677f-1(d)(1)(B)(i).

　　　　　Regarding Golden Dragon's argument that absent from the record is an explanation

as to why the price differences on its contract cannot be accounted for utilizing A-A methodology

as required by the targeted dumping statute, the court must disagree.  If the underlying picture is one

of targeted dumping, then the significance of the "effect size" of that circumstance, as analyzed using

---

[4]   Golden Dragon Reply at 2.

a standardized statistical interpretive tool such as Cohen's *d*, in and of itself "explains why such differences cannot be taken into account" using A-A methodology.  19 U.S.C. §1677f-1(d)(1)(B)(ii).

       The problem Golden Dragon faces, at this stage, is due to the fact that insofar as the trade laws are concerned, agreed-upon prices are always a matter of one's own choosing.  In this instance, although each contractually-obligated price was indeterminate until each LME-indexed spot price contingency occurred, that circumstance does not translate to an unanticipatable, uncontrollable, or unhedgeable pricing event.  The problem is rather akin to that of shifting exchange rates,[5] in that a price that is settled (determined) on the basis of an external event does not absolve an exporter of responsibility for "the date that all material terms of sale are established" with respect to the price that is thereby and thereon established.  *See* 19 U.S.C. §§ 1677a & 1677b; 19 C.F.R. § §351.401(i) & 351.414.

       Given precedent that precludes adjudication to the contrary, the court cannot conclude that Commerce's targeted dumping determination and its application of mixed alternative comparison methodology to analyze normal value and U.S. sales was unreasonable or not in accordance with law.

---

    [5] *See* 19 U.S.C. §1677b-1; 19 C.F.R. §351.415; *see also*, *e.g.*, *Union Steel Mfg. Co., Ltd. v. United States*, 36 CIT ___, 837 F. Supp. 2d 1307, 1321 (2012); *USEC, Inc. v. United States*, 31 CIT 1049, 498 F. Supp. 2d 1337 (2007); *Thyssen Stahl AG v. United States*, 19 CIT 605, 610, 886 F. Supp. 23, 28 (1995); *Torrington Co. v. United States*, 17 CIT 922, 936, 832 F. Supp. 379, 390-91 (1993).

### III.  *Mueller's USCIT Rule 56.2 Motion*

#### A.  Background

The trade statutes specify that a respondent's U.S. price is to be reduced by the costs,

charges, expenses or duties of bringing the subject merchandise from the factory to the United States.

19 U.S.C. § 1677a(c)(2).  One such movement expense is ocean freight. *See* Antidumping Manual,

Ch. 7 (2009).  Where the respondent does not incur ocean freight expenses from a market economy

supplier, Commerce will use the best available information from market economy sources in

accordance with its surrogate values methodology.  *See*, *e.g.*, *Freshwater Crawfish Tail Meat from

the PRC*, 78 Fed. Reg. 61331 (Oct. 3, 2013) (prelim. admin. rev. results) unchanged in 79 Fed. Reg.

22947 (Apr. 25, 2014) (final admin. rev. results).

With respect to the administrative review at bar,  Golden Dragon did not incur ocean

freight expenses from a market economy supplier.  Prelim. SV Memo (Nov. 15, 2013) at 5, PDocs

127-28.  Accordingly, for the *Preliminary Results* Commerce relied upon data that it acquired "from

the Descartes Carrier Rate Retrieval Database," which is a database of ocean freight rates that

Commerce has used in numerous antidumping duty administrative reviews. *Id.*; *see*, *e.g.*, *Welded

Stainless Pressure Pipe From the Socialist Republic of Vietnam*, 79 Fed. Reg. 806 (Jan. 7, 2014)

(prelim. determ. invest.), unchanged in 79 Fed. Reg. 31092 (May 30, 2014) (final determ. invest.)

and accompanying I&D Memo.

The Federal Maritime Commission ("FMC") regulations define "tariff" as "a

publication containing the actual rates, charges, classifications, rules, regulations and practices of

a common carrier or a conference of common carriers" and "the term 'practices' refers to those

usages, customs or modes of operation which in any way affect, determine or change the transportation rates, charges or services provided by a common carrier . . .." 46 C.F.R. §520.2. According to Mueller, the freight rates at issue are included in such tariffs, and that the FMC's regulations require all maritime common carriers to "keep open for public inspection, in automated tariff systems, tariffs showing all rates, charges, classifications, rules, and practices between all points or ports on their own routes and on any through transportation route that has been established."[6] 46 C.F.R. §520.3.

Mueller contends that Descartes is a repository of such information, and that Commerce used Descartes to download two different rate tariffs for base ocean freight from Qingdao to Los Angeles/Long Beach. Both tariffs specified a 20 foot container. The first was from "Round-The-World Logistics" for $1,650.00 filed on August 3, 2004. PDoc 127-8 at Ex. 8 at 1. This tariff specified that the commodity shipped was "hardware and hardware supplies, not otherwise specified." *Id*., at 3. The second was from "Seamodal Transport Corporation" for $2,100.00 filed on April 22, 2011. *Id*. Commerce divided those figures by the maximum weight for a 20-foot container to acquire a per pound rate. *Id*. Commerce then averaged the two rates and used the surrogate value of $0.03016 per pound for ocean freight. PDoc 127-8 at Ex. 1.

---

[6] Further, according to FMC's "Automated Tariff Registration System (Form-1) User Manual (Aug. 2007), the purpose of that system is (italics added) to "facilitate[ ] the registration of *tariff publication locations* by vessel-operating ocean common carriers (VOCCs), non-vessel-operating common carriers (NVOCCs), conferences, and marine terminal operators (MTOs) as required by Section 8 of the Shipping Act of 1984. The Federal Maritime Commission (FMC) uses Form-1 to permit shippers and other members of the public to obtain reliable and useful information concerning the rates and charges that will be assessed by common carriers and conferences for their transportation services; to ensure that carrier tariff publications are accurate and accessible; to protect the public from violations by carriers; and to review and monitor the activities of controlled carriers."

Mueller states that after issuance of the *Preliminary Results* and in accordance with 19 C.F.R. § 351.408(c), it provided for the record ten different ocean freight tariffs acquired from the same Descartes website, from five different common carriers, effective on the first day and last day of the POR, and covering transportation from Qingdao, PRC, to Los Angeles/Long Beach, California, United States of America. *See*  Mueller Post-Prelim. SV Submission (Dec. 11, 2013), PDoc 141.  Two of these carriers are VOCCs and the other three are NVOCCs.[7]  Mueller states it also provided the organization number assigned by the FMC and the "Applicable Tariff Code" for the VOCC and the NVOCC, *see id.*, and that for each of the five tariff codes, it provided the complete "Commodity List" relevant to the port of departure (Qingdao) and port of destination (Los Angeles/Long Beach) for the specified shipping date.  *See id.*  For each of the tariffs from the five common carriers, Mueller provided printouts of the "Calculation Results" for each shipping date, which show the base freight rate as well as fees and charges such as "PEAK SEASON SURCHARGE (PSS)," "BUNKER CHARGE (BC)," and "COST RECOVERY SURCHARGE (CRS)."  *See* PDoc 141 at Ex. 6.

For the *Final Results*, Commerce continued to rely on the two ocean freight tariffs from two common carriers used in the preliminary determination and it rejected Mueller's proposed tariffs. *IDM* at 7-8.  Commerce found that the rates that it acquired from the Descartes database were the best available information.  *Id.*  First, Commerce found that although its preferred ocean freight rates were filed prior to the beginning of the period, they "contain no indication that they have expired" and therefore, "can be considered to be contemporaneous with all months of the [period of

---

[7]  *See id*.

review].” *Id*. at 7.  Second, Commerce found that its rates were superior to Mueller's rates because "there is no information on the record to determine whether [Mueller's] rates were obtained from a market or NME source." *Id*.  Third, Commerce expressed concern about the specificity regarding the type of cargo for which Mueller's rates were applicable.  *Id*. at 8.

### B.  Analysis

Substantial evidence supports Commerce's finding that the two ocean freight rates upon which it relied come from "market" economy sources: both offices that issued the rates were located in the United States,[8]  which, for the time being, is presumed to be a "market" economy. *Cf.* Import Administration Policy Bulletin 03.1 (Feb. 28, 2003) ("[u]nder the U.S. antidumping law, countries receive market-economy treatment unless they have been formally designated as a NME country").

Mueller argues its submitted rates are the preferred best available information under Commerce's standard methodology for selecting among surrogate values, because Commerce's selected rates indicate they were effective on August 3, 2004 and from February 23-24, 2008, and that its submitted tariffs were effective on November 1, 2011 and October 31, 2012, or the dates corresponding with the beginning and ending dates of the period of review, and were published by the identical common carriers Commerce relied on that.  *See* PDoc 141 at Ex. 1, 2, 7, and 8.  Mueller argues its proposed tariffs, moreover, include all applicable charges and fees that an exporter like Golden Dragon would have incurred to bring its goods from the port of export to the United States,

---

[8]  *IDM* at 7-8.  *See* Prelim. SV Memo (Nov. 15, 2013) at Ex. 8, PDocs 127-28 (showing issuing office for one rate is Round-The-World Logistics (U.S.A.) Corp. located in Dallas, Texas, and issuing office for other rate is Seamodal Transport Corporation located in Hayward, California).

whereas the tariff excerpts relied upon by Commerce only contained the  applicable base freight rate. Mueller argues that there should have been no contest between the potential surrogate values and that its "superior" proposed values should have been used.

Mueller's argument here focuses on contrasting the reliability of the rates chosen by Commerce to the ten tariffs it submitted.  Mueller contends it demonstrated that its proffered data were from Commerce's usual market economy surrogate value source, generated using Commerce's preferred methodology, included all associated fees and surcharges applicable in the marketplace, and were contemporaneous with the POR.  In its reply brief, Mueller also argues that Commerce and Golden Dragon have "concede[d] that four of the ten ocean freight tariffs on the record are from the same two common carriers that Commerce used in the Final Results."  Mueller Reply at 2, referencing Def. Resp. at 30; GD Resp. at 6; PDocs 127-28 at Ex. 8; PDoc 141.  Mueller thus contends from this that the four tariffs it submitted are thus market economy sources, notwithstanding Commerce's contrary conclusion in the *Final Results*.  *Id*.

The court fails to discern that Commerce's and Golden Dragon's "concession" leads to the conclusion Mueller advances.  Commerce found that in contrast to the two ocean freight rates it selected, the quotes submitted by Mueller did not include "filing information, and specifically, the issuing office location that is the source of the rate."  *IDM* at 7-8.  *See* PDoc 141 at Exs. 1-10. Commerce thus maintains that it lacked sufficient information to prove that Mueller's quotes came from market economy sources, and reasonably rejected them.  The record documentation of the two tariffs Commerce selected provides pages headed "Rate Detail" and "Tariff Detail" under which the "organization" and "tariff" are clearly indicated as pertaining to "ROUND-THE-WORLD

LOGISTICS (U.S.A.) CORP." and "SEAMODAL TRANSPORT CORPORATION", respectively. The "Tariff Detail" pages have sections for "Parent Organization", "Tariff Information", "Filing Information" (date of filing, effective date, expiration date -- which is left blank on both tariffs -- and other matters), "Publishing Office", "Issuing Office" and "Origin Scope" (a list of countries of origin covered by the tariff).

The record documentation of the four tariffs Mueller claims as issued by the "same" common carriers, by contrast, is far different.  Although they appear to derive from the Descartes database, as they bear the same appearance (logo, typeface, sectional layout, *et cetera*), they differ in that the pages are headed "Calculation Results" and "Commodity List", sections describing such matters as commodity, origin (Qingdao), destination (Long Beach), base freight, currency date, shipping date,  and other matters.  Mueller argues that the fact that the freight rates at issue are tariffs published by maritime common carriers in accordance with Federal Maritime Commission regulations "establishes the bona fides of their validity as market economy sources."[9]  However, the only "link" on Mueller's preferred tariffs is to the identity of the organization that maintains the tariff via the tariff code,[10] and the "location" of the tariff, as maintained by the organization to which the

---

[9]  More precisely, Mueller argues those regulations provide for all maritime common carriers to "keep open for public inspection, in automated tariff systems, tariffs showing all rates, charges, classifications, rules, and practices between all points or ports on their own routes and on any through transportation route that has been established." 46 C.F.R. § 520.3. Descartes is a publicly available repository of such information, and therefore "the fact that these tariffs come from the Federal Maritime Commission establishes the bona fides of their validity as market economy sources."  Mueller Reply at 9.

[10]  46 C.F.R. §520.3(e) provides: "Location of tariffs. The Commission will publish on its website, www.fmc.gov, a list of the locations of all carrier and conference tariffs."  Handwritten under the Descartes logo on Mueller's proposed tariffs are notations such as  "Round the World",

(continued...)

organization code is assigned, is not necessarily the location of the issuing office of the tariff rate.

In other words, it is not inconceivable that a particular tariff rate has been issued by an office located

in a non-market economy country but is maintained, for purposes of tariff "location," by its parent

company, thus rendering the tariff rate suspect for purposes of antidumping duty calculation, and the

court cannot discern from the record whether the "issuing offices" of Round-The-World Logistics

and Seamodal Transport are only located in the United States.  The other six tariffs for which

Mueller argues also suffer from the same lack of precision with respect to the exact identity and

location of their respective issuing offices.

Whether the court might reach a different result, *de novo*, it must conclude that

substantial evidence supports Commerce's conclusion, and the parties' remaining arguments on the

issue therefore need not be addressed.

IV.  *Conclusion*

Consistent with the foregoing, this matter must be, and hereby is, remanded for

further proceedings before Commerce.  Results of remand shall be due November 19, 2015.  Within

five business days of filing thereof, the parties shall confer and submit a joint status report governing

further proceedings.

**So ordered**.

Dated:  August 19, 2015                              /s/  R. Kenton Musgrave
         New York, New York                          R.  Kenton Musgrave, Senior Judge

---

[10]  (...continued)
"Round the World Logistics", "Sea Modal", "Seamodal Transport" *et cetera*, and the court takes
judicial notice of the fact that "Round-the-World Logistics (U.S.A.) Corp." and "Seamodal Transport
Corporation" have been assigned FMC organization numbers "018255" and "005030", respectively.