Slip Op. 16 - 80

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GOLDEN DRAGON PRECISE COPPER TUBE GROUP, INC., HONG KONG GD TRADING CO., LTD., GOLDEN DRAGON HOLDING (HONG KONG) INTERNATIONAL, LTD., and GD COPPER (U.S.A.) INC., | |
| Plaintiffs, | |
| v. | Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | Consol. Court No. 14-00116 |
| Defendant, | |
| and | |
| CERRO FLOW PRODS., LLC, WIELAND COPPER PRODUCTS, LLC, MUELLER COPPER TUBE PRODUCTS, INC, and MUELLER COPPER TUBE CO., INC., | |
| Defendant-Intervenors. | |

**OPINION**

[Sustaining remand results of second administrative review of antidumping duty order on copper pipe and tube from the People's Republic of China.]

Decided: August 23, 2016

*Kevin M. O'Brien*, *Christine M. Streatfeild,* and *Yi Fang*, Baker & McKenzie, LLP, of Washington DC, for the plaintiffs.

*Michael D. Snyder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for the defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of Counsel on the brief was *David P. Lyons*, Attorney, Office

Consol. Court No. 14-00116                                                                                         Page 2

of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

    *Thomas M. Beline*, *Jack A. Levy*, *Jonathan M. Zielinski*, *Nathaniel J. Halvorson*, Cassidy Levy Kent (USA) LLP, of Washington DC, for the defendant-intervenors.

    Musgrave, Senior Judge:  Before the court are the *Final Results of Redetermination Pursuant to Court Order*, Golden Dragon Precise Copper Tube Group, Inc., et al. v. United States, Court No. 14-00116, ECF No. 89 (Mar. 23, 2016) ("Remand Results") filed by defendant's Department of Commerce, International Trade Administration ("Commerce").  Commerce filed these Remand Results pursuant to *Golden Dragon Precise Copper Tube Group, Inc. v. United States*, Court No. 14-00116, Slip Op. 16-17 (Feb. 22, 2016) ("*Golden Dragon III*")*,* which granted a voluntary remand of the final results of the second administrative review of *Seamless Refined Copper Pipe and Tube From the People's Republic of China,* 79 Fed. Reg. 23324 (Apr. 28, 2014), subsequently amended, 79 Fed. Reg. 47091 (Aug. 12, 2014) ("Final Results") to facilitate Commerce's solicitation and response to comments to the Remand Results prior to publication in the Federal Register.  As discussed herein, the Remand Results are supported by substantial evidence.  Accordingly, the Remand Results will be sustained.

*I. Background*

    The court presumes familiarity with the case[1] but facts relevant to the instant issues are briefly summarized here.  Following publication of Commerce's amended Final Results in

---

[1] *See Golden Dragon Precise Copper Tube Group, Inc. v. United States*, Court No. 14-00116, Slip Op. 14-85 (July 18, 2014) ("*Golden Dragon I*") (remanding to consider ministerial error allegations ); *Golden Dragon Precise Copper Tube Group, Inc. v. United States*, Court No. 14-00116, Slip Op. 15-89 (Aug. 19, 2015) ("*Golden Dragon II*") (remanding to further explain Commerce's selection of Thailand as surrogate value country); and *Golden Dragon III*.

August 2014, Plaintiffs Golden Dragon Precise Copper Tube Group, Inc., Hong Kong GD Trading Co., Ltd., Golden Dragon Holding (Hong Kong) International, Ltd., and GD Copper (U.S.A.) Inc. (collectively "Golden Dragon") and Defendant-Intervenors Cerro Flow Products, LLC, Wieland Copper Products, LLC, Mueller Copper Tube Products, Inc., and Mueller Copper Tube Company, Inc. (collectively "Mueller") challenged aspects of the Final Results. Following the first voluntary remand to address ministerial errors, the court remanded the Final Results for further explanation or reconsideration of its selection of Thailand as the primary surrogate value country and its selection of the Thai producer's financial statement to calculate the surrogate financial ratios. *See Golden Dragon I & Golden Dragon II*. Commerce filed remand results, leaving the surrogate value country selection unchanged and continuing to select the Thai producer's financial statements, *see* ECF No. 82 (Nov. 18, 2015), but ultimately requested a second voluntary remand to solicit comments on the draft remand results following a procedural oversight on its part. *See*, *generally*, *Golden Dragon I*, *Golden Dragon II*, and *Golden Dragon III*. Following the second voluntary remand, Commerce solicited, received, and responded to comments to its draft remand results prior to publishing the Remand Results and filing them with this court. Remand Results at 1-2; *see also* Pl's Comments on Remand Redetermination ("Pl's Br.").

In the Remand Results now before the court, Commerce continued to select Thailand as the primary surrogate value country and continued to use a set of financial statements from the Thai producer, Furukawa Metal (Thailand) Public Company Limited ("Furukawa"), to calculate Golden Dragon's surrogate financial ratios as part of the larger factors of production ("FOP") calculations. Remand Results at 32-33; Def's Br. at 4. Relevant here, Commerce reasoned that the Furukawa financial statement constituted the best available information in several respects: (1) there

was no direct record evidence of actual receipt of a countervailable subsidy by Furukawa; (2) Furukawa produces merchandise identical to that of Golden Dragon, whereas the Ukrainian producer (whose financial statement is preferred by Golden Dragon, Joint Stock Company Artemivskyy Plant Treated Colored Metals ("Artemivskyy")) produces merely comparable merchandise; (3) the Artemivskyy statement were supported by a qualified auditors' opinion which "identified uncertainties with respect to aspects of the data"; and (4) the Furukawa statement contained contemporaneous surrogate data for copper slag and ash, whereas the Artemivskyy statement did not. *See* Remand Results; Def's Br. at 3-4.

Golden Dragon was the sole party to comment on Commerce's draft remand results, and Commerce made no changes to the Remand Results following consideration to those comments. Remand Results at 2. Golden Dragon continues to dispute the selection of Thailand as the primary surrogate value country and the use of the Thai financial statement in calculating the surrogate financial ratios. Pl's Br. at 1. Specifically, it argues that (1) the Furukawa statement contain evidence of subsidization and the Ukrainian statement is preferable because it does not contain any such evidence; (2) Commerce did not adequately characterize the goods produced by Artemivskyy; (3) the Ukrainian auditors' position should not render the Artemivskyy statement less reliable than the Furukawa statement; and (4) the Furukawa statement is less contemporaneous than the Artemivskyy statement. Golden Dragon asserts that in light of these flawed determinations, Commerce must reconsider the evidence before it and determine either to select Ukraine as the primary surrogate country or, in the alternative, to utilize the Artemivskyy statement in calculating the surrogate financial ratios. Pl's Br. at 3-4.

II. *Discussion*

When calculating a dumping margin for products from a non-market economy ("NME") country, such as the People's Republic of China, Commerce typically compares the product's normal value, derived from FOPs as valued in a surrogate market economy country, to the product's export price.[2] Commerce must use the "best available information" in selecting surrogate data. 19 U.S.C. §1677b(c)(1)(B). The surrogate data must, "to the extent possible", be selected from a market economy country that is "at a level of economic development comparable to that of the [NME]" and is a "significant producer of comparable merchandise." *Id.* at §1677b(c)(4). For each administrative review, Commerce usually selects a primary surrogate country from a list of countries that it considers to be at a level of economic development comparable to that of the NME country, based upon per capita gross national income ("GNI"). *See* Policy Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Mar. 1. 2004); *see also* 19 C.F.R. §351.408(c)(4). Commerce has stated a regulatory preference to "normally . . . value all [FOPs] in a single surrogate country." 19 C.F.R. §351.408(c)(2).

To establish surrogate financial ratios, Commerce calculates such ratios based on publicly available financial statements from producers of identical or comparable merchandise in the surrogate country. 19 C.F.R. §351.408(c)(4). In selecting from competing surrogate value sources, Commerce evaluates potential data for reliability, availability, quality, specificity and contemporaneity. Remand Results at 5; *see*, *e.g.*, *Certain Kitchen Appliance Shelving and Racks*

---

[2] "Normal value" is the price at which the product is sold or offered for sale in the exporting country. *See* 19 U.S.C. §1677b(a)(1)(B). "Export price" or "constructed export price" is the price as which the product is first sold to an unaffiliated purchaser in the United States. *See* 19 U.S.C. §1677a(a).

*from the PRC*, 74 Fed. Reg. 36656 (July 24, 2009) and accompanying IDM at Comment 10. In calculating surrogate financial ratios, Commerce determines which set of statements best satisfies these factors to comport with its statutory duty of using the "best available information".

In determining whether substantial evidence supports Commerce's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). However, the court "may not reweigh the evidence or substitute its own judgment for that of the agency." *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted.).

Here, Golden Dragon essentially asks the court to reweigh the evidence on the record and displace the agency's interpretation with one it favors. The court is not permitted to do so, *see Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272, and as has been noted by this court previously, "the critical question when valuing the [FOPs] is 'whether the methodology used by Commerce is based on the best available information and established antidumping margins as accurately as possible.'" *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 666, 387 F. Supp. 2d 1236, 1245 (2005), citing *Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001). Golden Dragon does not persuade that the Furukawa statement is not the best available information to use in calculating the surrogate financial ratios, nor that Commerce's selection of Thailand as the primary surrogate country is unreasonable or unsupported by substantial evidence. Accordingly, Commerce's Remand Results will be sustained.

A.

Golden Dragon continues to argue that Commerce should reject the Furukawa statement because it contains evidence of subsidization. The court in *Golden Dragon II* remanded to Commerce for further explanation, observing that the Furukawa statement did appear to contain evidence of subsidization. *Golden Dragon II*, 39 CIT at ___ (finding a note to the Furukawa statement "plain enough" in referencing a potentially countervailable subsidy and remanding for further explanation or reconsideration as appropriate). However, Commerce has provided adequate explanation as to why that evidence does not form a sufficient basis to reject the Thai statement.

In making its determination on this point, Commerce applied its typical practice of determining whether an actual benefit was received by the company by determining first, whether the reference program was countervailable, and second, whether there was direct evidence such as a line item in the statement confirming receipt of such a benefit. Remand Results at 7-12; *see DuPont Teijin Films v. United States*, 37 CIT ____, ___, 896 F. Supp. 2d 1302, 1310-1013 (2013) ("[i]t is reasonable for Commerce not to reject financial statements that include a policy for accounting for subsidies because the receipt of a subsidy, and not the policy itself, causes the distortion in the financial statement that impacts the calculation of surrogate financial ratios"). Finding no direct evidence of receipt of a subsidy, Commerce affirmatively determined that Furukawa had not received such a benefit during the POR, and therefore reasonably did not reject the Furukawa statement. *Id.* at 8-11. Golden Dragon points to no other evidence within the record to suggest a reason for Commerce to reject the Furukawa statement. Commerce's decision to prefer the Furukawa statement after determining there was no actual benefit received is supported by substantial evidence.

B.

Golden Dragon next argues that Artemivskyy produces identical merchandise, and even that if Commerce determines it produces comparable merchandise that the statement would still satisfy the relevant statute which requires only "comparable merchandise". Pl's Br. at 3; *see* 19 U.S.C. §1677b(c)(4). However, Commerce's preference for the Furukawa statement in this instance is not impugned by Golden Dragon's characterization of Artemivskyy's products.

As stated in the Remand Results, in choosing financial statements for calculating surrogate financial ratios, Commerce strives to identify companies whose operations most closely resemble the respondent's experience. Remand Results at 13; *see also Hand Trucks and Certain Parts Thereof From the PRC*, 78 Fed. Reg. 28801 (May 16, 2013) and accompanying IDM at comment 2. Commerce determined that Furukawa's financial statement unambiguously "made clear" that Furukawa produces products identical to Golden Dragon's products, whereas Artemivksyy's financial statement was less clear in its description of the goods produced. Remand Results at 14, citing Letter from Golden Dragon, "Refiling of Golden Dragon's Surrogate Value Rebuttal Comments" (May 29, 2013), PDoc 42, Ex. 13, note 1 ("[t]he principal business of [Furukawa] is manufacturing and distributing of seamless copper tube"); *cf.* Letter from Golden Dragon, "Re: Publicly Available Surrogate Value Information" (Dec. 11, 2013), PDoc 141, Ex. 1, at Notes (English Translation) (Artemivskyy produces "finished products in ingots, round and flat rolled products, sanitary fittings and other"). Commerce reasonably determined that an unambiguous declaration of production of goods identical to those produced by the respondent was preferable to a less clear declaration of goods produced, and Golden Dragon does not present evidence that persuades otherwise. Further, "the preference for use of data from a single surrogate

country could support a choice of data as the best available information where the other available data, upon a fair comparison, are otherwise seen to be fairly equal." *Peer Bearing Co.-Changshan v. United States*, 35 CIT ___, ___, 804 F. Supp. 2d 1337, 1353 (2011) (citation and internal quotation omitted). Commerce's preference for using a financial statement that unambiguously states it produces identical merchandise is reasonable and supported by substantial evidence.

C.

Commerce also determined that the Furukawa statement was preferable to that of Artemivskyy because the Artemivskyy statement was supported by a qualified auditor's opinion, stating that the auditor "was not able to observe the inventory of existing fixed assets, reserves, other non-current assets and liabilities since the inventory took place before the appointment of our auditors . . . [w]e believe that certain minor deviations may exist in quantities of fixed assets. Due to the nature of the accounting records, we were unable to confirm the number of records using other audit procedures." PDocs 142-44 at Ex. 1. Golden Dragon argues that Commerce has never required "unqualified" auditors opinions in the past and that the Artemivskyy statement should not be set aside because of the qualified opinion. Pl's Br. at 11-12, citing *Final Determination of Sales at Less Than Fair Value: Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from the Russian Federation*, 64 Fed. Reg. 38626 (Jul. 19, 1999) (Commerce stated that "it is not required that the financial statements be audited").

Golden Dragon's argument does not persuade. Commerce reasoned that the "qualified nature of the auditor opinion raises questions with respect to the [Artemivskyy] statements' suitability." Remand Results at 18. There have been no such "questions raised" with regard to the Furukawa statement. Congress has vested Commerce with considerable discretion in

selecting the best available information to value FOPs. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999); *see also Allied Pacific Food (Dalian) Co. v. United States*, 32 CIT 1328, 1342, 587 F. Supp. 2d 1330, 1344 (2008). It is within Commerce's discretion to prefer a financial statement that has not been the subject of an auditor's qualified opinion to one that has had questions raised about its suitability. Golden Dragon does not persuade that Commerce's preference for the Furukawa statement with respect to this issue is unreasonable.

### D.

Finally, Golden Dragon argues that the Artemivskyy statement is more contemporaneous than the Furukawa statement, as the Artemivskyy statement covers 10 months of the POR compared to Furukawa's 2 months. Pl's Br. at 10. Commerce does not dispute this fact. Remand Results at 15-16 ("the Artemivskyy statement is more contemporaneous with the POR"). While the Artemivskyy statement may be more contemporaneous than the Furukawa statement, the selection of a financial statement requires balancing of several factors, of which more overlap with the POR is one. It is "well-established" that Commerce considers data that overlap any portion of the POR to be contemporaneous. *Id*. at 16; *see, e.g.*, *Utility Scale Wind Towers From the Socialist Republic of Vietnam*, 80 Fed. Reg. 55333 (Sept. 15, 2015), at Comment 4.B. The Thai financial statement is therefore a viable option for Commerce to select. Further, "[n]o one factor is dispositive when conducting this analysis." Remand Results at 16; *see also Hangzhou Spring Washer Co.*, 29 CIT at 672, 387 F. Supp. 2d at 1250 ("Commerce has the statutory discretion to give greater weight to one [factor] over the other, provided it offers a reasoned explanation when such a decision deviates from past practice"). Commerce further explains that the Artemivskyy statement did not contain contemporaneous values for slag and copper ash inputs, whereas the Furukawa

statement contained contemporaneous data for all relevant inputs.  *See* Remand Results at 16. Golden Dragon does not persuade that the Furukawa statement is not the best available information merely because the Artemivskyy statement is more contemporaneous than the Furukawa statement.

### III.  *Conclusion*

Commerce's Remand Results appearing in compliance with the orders of remand, supported by substantial evidence, and in accordance with law; and there appearing to be no reason otherwise for requiring further remand, the Remand Results will be sustained.

/s/ R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: August 23, 2016
 New York, New York